SURVIVORS BENEFIT INSURANCE CO., a corporation, Appellant,

v.

Edward G. FARMER, Superintendent, Division of Insurance, Department of Business and Administration, Respondent.

No. 57527.

Supreme Court of Missouri, Division No. 1.

Oct. 14, 1974.

**566**

Irving Kuraner, Kansas City, for appellant; Kuraner, Dingman, Brockus, Kinton & Lowe, Kansas City, of counsel.

Ellery J. Holler, Gen. Counsel, Div. of Ins., Jefferson City, for respondent.

BARDGETT, Presiding Judge.

Appellant, Survivors Benefit Insurance Company, appeals from the judgment of the Circuit Court of Cole County which affirmed the order of the Superintendent of the Division of Insurance, Department of Business and Administration of Missouri,

which order disapproved certain life insurance policy forms submitted by appellant under the provisions of section 376.675, RSMo 1969, V.A.M.S. Edward G. Farmer has been substituted as respondent herein as the successor to the former Superintendent of Insurance William Y. McCaskill who was superintendent at the time this appeal was filed. Since a state officer is a party and the appeal was taken prior to January 1, 1972, jurisdiction is in this court by virtue of Art. V, sec. 3, Mo.Const. 1945, V.A.M.S.

Survivors Benefit Insurance Company, appellant, is a corporation organized under chapter 376, RSMo 1969, V.A.M.S., and is licensed to transact business of life insurance in Missouri by the Division of Insurance and is subject to regulations by the Superintendent of Insurance, respondent. In 1963 the superintendent approved for use by appellant a certain life insurance contract form ART 9–62, an Annual Renewable Term policy of life insurance (ART). The policy forms and endorsements which are the subject of this appeal were proposed to be used with the ART contract form previously approved. Appellant did not file a new basic policy contract form with the superintendent, but rather the forms filed consisted of endorsements and agreements to be used with the basic ART policy.

The ART policy is a one-year-term policy guaranteed renewable for life at the option of the insured without any further medical examination. At the end of each year the policyholder has three options. He can either maintain the same amount of insurance as in the previous year and pay an increased premium, or he can pay the same premium that he paid during the previous year and purchase a lesser amount of insurance, or he may reduce the amount of insurance to any amount he wants and pay the premium applicable to that amount. If the policyholder maintains the same amount of coverage, then in each succeeding year his premium is higher because he is one year older, and the compa-

ny's risk is greater than the previous year. All of the premium goes for protection and is designed to give the maximum amount of dollar protection at the least cost rather than the investment in cash value as in an ordinary life policy. ART has no cash value.

According to appellant, the chief difficulty with its ART policy from the company's standpoint is that, there being no cash value built up, the policyholder has nothing to lose by permitting the policy to lapse and buying a similar policy elsewhere, and such lapses are encouraged by agents who are interested in earning additional first-year premiums. The appellant believed that if it could discourage lapsing the difficulty with the ART policy would be solved. To that end the appellant designed its Deposit Annual Renewable Term Policy (DART). That policy contract form has been filed with and approved by the superintendent for use in Missouri. It is not a collateral agreement or endorsement used with the ART policy. Although the DART policy is not in issue, it was the subject of testimony before the superintendent and bears a relationship to the subsequent course of action of appellant in seeking approval of the collateral agreement and endorsement forms to the ART policy which are the subject of this case.

Under the DART policy the insured is required to deposit as a special premium $10.00 per thousand dollars at the time the policy is purchased. If the insured dies, his beneficiary gets the face amount of the policy plus the deposit. If he lives to age 65 and keeps the policy in force, the cash value of the policy when it matures at age 65 is the amount of the deposit plus 6% interest compounded annually. If the insured lapses the policy in the first three years, no part of the deposit is refunded. If it lapses at the end of the fourth year, the insured gets $4.00 of the $10.00 deposit back, and if it lapses in any succeeding years he gets back a greater amount of the deposit, and if it lapses at the end of the tenth year the entire deposit is refunded.

According to appellant, the special premium deposit protects the company against the loss caused by early lapse and, therefore, the annual premiums need not take that possibility into account. Consequently, the annual premiums are comparatively low and the insured gets high protection for low annual premiums.

The appellant asserts that the DART policy almost eliminated the early lapse difficulty it was experiencing with the ART policy but two new problems arose which appellant sought to solve by the use of the collateral agreement and endorsement forms involved in this case. Appellant denominates these forms taken with the ART policy as its Collateral Annual Renewable Term Policy (CART). Respondent asserts that the forms in issue did not constitute any new contract or policy but rather are collateral agreement forms and endorsements for use with ART policies and which, if approved, could be used by appellant with other forms of insurance contracts. Appellant's brief sets forth the problems resulting from the DART policy and appellant's proposed solutions are as follows:

"The DART policy almost eliminated the lapse problem. However, the DART policy did create two other problems or complaints. Some policyholders preferred not to deposit money, but preferred instead to put up securities which in their opinion were better investments than the money deposited with the Company. Some complained that the cash deposit required them to liquidate securities which they preferred to keep. Another problem was that the DART policy terminates at age 65, while some persons wish their policies to go beyond that age. In order to meet those problems the Company devised the policy here in question, its Collateral Annual Renewable Term Policy or CART. The CART policy is like the ART policy in that it is permanently renewable, and unlike the DART policy does not terminate at any given age. The premium arrangement is just the reverse of the DART poli-

cy. In the DART policy the Company takes the special premium deposit at the beginning from the policyholder. In the CART policy the Company takes no special premium from the policyholder unless he terminates within the first ten years, in which case he pays a termination premium. During the first six years the termination premium is $10.00 per $1,000, and it reduces $2.00 per thousand per year so that after the 10th year there is no termination premium of any kind. Instead of requiring the policyholder to pay the termination premium in advance, as does the DART policy, the Company takes a promise from him to pay the termination premium if he lapses in less than ten years.

"In order to secure that promise the policyholder must put up collateral in the form of listed stocks or savings accounts. If the collateral consists of stock the collateral must be 150%. If the policyholder does not lapse the policy before the end of the 10th year he never pays the termination premium and his collateral is returned to him. He may substitute collateral if it meets with the approval of the Company. The CART policy permits the insured to have large protection at low cost and at the same time to invest his money or keep it invested in the way he wants it invested. The insured's promise to pay the termination premium is not taken into premium income. Neither is the collateral taken into premium income. If the insured dies no termination premium is payable and the collateral is released at the time of his death."

The findings of fact and conclusions of law made by the superintendent are as follows:

## "FINDINGS

"That pursuant to a stipulation entered into between petitioner, Survivor's Benefit Insurance Company, and respondent, Superintendent, Division of Insurance, it was agreed by and between the parties that petitioner had submitted certain life insurance policies and forms for approval or disapproval by the respondent for use by said petitioner in the State of Missouri; that on or about the 28th day of May, 1969, said respondent, acting under the authority granted by Section 376.675, R.S. Mo., [V.A.M.S.], did formally and officially disapprove certain of said policy forms and endorsements; that petitioner thereafter, on or about the 13th day of June, 1969, filed with the respondent a formal request for a hearing under the provisions of Section 376.675, Subsection 2, R.S.Mo., [V.A. M.S.]; that a hearing upon such request was duly convened on the 13th day of November, 1969, at the office of the respondent pursuant to stipulation and agreement between the parties as to time and place thereof.

"That the forms and endorsements submitted to respondent by petitioner when taken together or in conjunction with each other comprise what has been described by petitioner as a 'Collateral Annual Renewable Term' policy; that such collateral annual renewable term policy (CART) encompasses a new concept of marketing an annual renewable term policy which is described by petitioner as a plan whereby the policyholder, instead of paying the entire premium cost in advance, in order to assure the persistency of the policyholder, gives to petitioner a promise to pay to petitioner a termination premium upon termination of the insurance contract at any time prior to the end of the 10th contract year for any reason other than the death of the insured, and in order to secure that promise, the policyholder puts up collateral in the form of listed stocks or a savings account of a bank or savings and loan association. If the policyholder puts up as collateral an assignment of a savings account of a bank or savings and loan association, the fund assigned to petitioner must be one hundred percent of the termination premium agreed upon; if the policyholder desires to put up marketable securities acceptable to the company, such securities must have a market value in an

amount equal to one hundred fifty percent of the termination premium agreed upon.

"At the time of delivery of the policy to the policyholder and when the policyholder pays his first premium, he is required to deliver a collateral agreement and an assignment of a savings account or an assignment of stock to the petitioner and that the petitioner will not issue a contract to a policyholder without the execution of a collateral agreement and an assignment to the petitioner of savings or securities in order to secure the collateral agreement; that the assignment of such collateral is just like a bank loan to back up the promise to pay in the future.

"That, when it takes a promise to pay a termination fee from the policyholder or insured, which promise to pay is allegedly incorporated in the policy, petitioner on its books does not take that promise to pay into premium income nor does the petitioner on its books take the collateral into premium income, and that, although the policyholder does deposit with petitioner in advance a termination premium of ten dollars per $1000 amount of insurance, it is petitioner's contention that this does not constitute any part of premium income and therefore petitioner is not required to pay premium tax on the collateral agreement (promise to pay) or on the assignment of collateral to secure payment of the termination premium.

"That in addition to his position as president of Survivor's Benefit Insurance Company, James E. Stowers is interested in and is president of Twentieth Century Investors, a mutual fund; that said James E. Stowers does intend to sell the Twentieth Century Investors mutual fund in connection with this contract or, in the alternative, would like, if the policyholder would do so, for the policyholder to put up Twentieth Century mutual funds as collateral.

"That the concept of a 'termination premium' as embodied in the forms and endorsements heretofore submitted to respon-dent by petitioner constitutes a new concept in the state of Missouri as to marketing annual renewable term policies; that a termination premium and the concept thereof, if approved by respondent, could be applied to other forms of insurance than annual renewable term policies; that the application of the termination premium concept to other types of insurance policies and the approval of this concept of a termination premium would make the standard non-forfeiture law completely unenforceable and that really it would be the means of getting around the law.

"That in the event the collateral deposit in the form of securities is not sufficient to meet the obligation of the termination premium promised by the policyholder, then the company's right to collect from the policyholder the difference between the termination premium due and the amount that the collateral would bring is not good for the policyholders; and that this concept, if approved, could require the policyholder not only to pay the premiums for a contract, which he traditionally must do as his *sole* obligation, but also to pay a surrender charge out of his own funds that he has not already given to the company, which is not good for the insuring public.

"CONCLUSIONS OF LAW

"(1) The life insurance policy forms and endorsements (other than form ART 9–62) heretofore submitted by petitioner to respondent for approval for issuance and use in the state of Missouri are deemed not to be in the best interest of the general public and policyholders of the state of Missouri contrary to Section 374.040, R.S.Mo., [V. A.M.S.], in that the concept of a termination premium requires the policyholder to divest himself of certain rights of ownership with respect to securities placed as collateral for payment of the termination premium, which is in effect a surrender charge, and restricts the policyholder's ability to sell his securities at a time when he deems it advisable since the right of the

policyholder to substitute securities other than those originally pledged as collateral is subject to rejection by the company or a substitution charge by the company which is not a fixed charge but is based on the company's current rate at the time of substitution; and in that the concept further creates policyholder obligations other than making timely premium payments and therefore does violence to the traditional concept of an insurance contract as a unilateral contract, and, by requiring the policyholder to make promises for future payment in addition to the payment of premium, changes the contract to a bilateral contract; that the title of the 'annual renewable term' insurance policy submitted as form ART 9–62 misrepresents the true nature of the contract when applied to the proposed termination premium concept which includes a provision for the collection of a termination premium, and that the consideration provision of form ART 9–62 does not accurately describe the true situation when collateral agreement form number 5–28–68–200 is completed and endorsement form number tpd 5–68 is attached to and made a part of the policy in that the consideration clause of said policy form number ART 9–62 provides that the insurance is granted in consideration of the application and 'payment of premiums as herein provided' and makes no mention of the additional consideration required in the form of the promise to pay a termination premium or the requirement for pledging funds or securities;

"(2) The concept of charging a termination premium provides a means for avoidance of the premium tax requirements of Sections 148.320 and 148.370, R.S.Mo., [V.A.M.S.] which require, in essence, that petitioner company shall annually pay a tax upon the direct premiums received by it from policyholders in this state, whether in cash *or in notes,* or *on account of business done in this state,* for insurance of life, property or interest in this state at the rate of two percent per annum; the concept of taking a promissory note (collateral agreement) from the policyholder at the time of delivery of the contract is considered to be a direct premium as defined in said Section 148.370 and thus subject to the premium tax laws of the state of Missouri.

"(3) The concept of a termination premium, if approved by respondent, could be applied to contracts of insurance other than the annual renewable term policy submitted by petitioner and thus could provide a vehicle which could be used to avoid the reserve and non-forfeiture requirements of Sections 376.380 and 376.670, R.S.Mo., [V.A.M.S.].

"(4) The forms submitted for approval permit unfair discrimination contrary to the provisions of Sections 375.936(7) and 376.500, R.S.Mo., [V.A.M.S.] in that policyholders purchasing an annual renewable term policy (form ART 9–62), without the execution of a collateral agreement pay a higher premium than policyholders purchasing the same policy with execution of the collateral agreement; in that policyholders who execute the collateral agreement and post as collateral an assignment of funds in a bank or savings association are required to post less collateral than those policyholders who post securities as collateral; in that policyholders who purchase mutual funds from Twentieth Century Investors are not required to post the entire amount of the collateral upon delivery of the policy whereas policyholders posting other securities are required to post the entire amount of collateral upon the delivery of the policy.

"(5) The release of collateral posted under the termination premium concept constitutes a rebate of premium income in violation of Subsection (8) (a) of Section 375.936, R.S.Mo., [V.A.M.S.] in that the collateral agreement constitutes a promissory note which is defined to be premium income under Section 148.370, R.S.Mo., [V.A.M.S.], and for the further reason that said Section 375.936 (8) (a) prohibits

the selling or offering to sell as an inducement to purchase life insurance any stocks, bonds, or other securities of any insurance company or other corporation, association or partnership or anything of value whatsoever not specified in the contract; the collateral agreements required under the termination premium concept as submitted by petitioner do constitute an agreement as to the contract other than as plainly expressed in the policy, such also being prohibited under Sections 376.500 and 375.936, R.S.Mo., [V.A.M.S.]

"(6) The consideration provision of policy form number ART 9–62 is not fully descriptive and does not accurately reflect the true situation when the termination premium concept is employed and therefore deemed not to be in the best interest of the insuring public and the policyholders. (Section 374.040, R.S.Mo., [V.A.M.S.])

"(7) The forms submitted for approval permit unfair discrimination contrary to the provisions of Sections 375.936 (7) and 376.500 in that a deceased policyholder under the termination premium concept is not carrying his fair share of expenses in that upon the death of the policyholder under the termination premium concept, the collateral held under any one of the collateral agreements is released and therefore a termination premium is not due with respect to a policy where the policyholder dies on the third policy anniversary (for example) but it is required to be paid on a policy terminated on the third policy anniversary for nonpayment of premium; the expenses incurred on a policy terminated at the end of three years are the same regardless of whether such policy was voluntarily terminated for nonpayment of premium or involuntarily terminated by death and to waive payment of the termination premium in the event of death is to excuse that policyholder from payment of his equitable share of administrative expenses, thus constituting a discrimination against other policyholders contrary to the provisions of Sections 375.936 (7) and 376.500, R.S.Mo., [V.A.M.S.].

"(8) The concept of a termination premium tends to discourage conversion by the policyholders from term insurance to permanent insurance of the same or of lesser face amounts at a point or time when a delay in exercising conversion rights could prove to be extremely costly to the insured, which is deemed to not be in the best interests of the insuring public. (Section 376.040 [374.040] R.S.Mo.,[V.A.M.S.])

"(9) This conclusion was withdrawn by the superintendent.)

"ORDER

"NOW, THEREFORE, based upon the evidence, findings and conclusions of law, and pursuant to the authority vested by Sections 374.040 and 376.675, R.S.Mo., [V.A.M.S.], it is ORDERED that the policy forms and endorsements (except ART 9–62) heretofore submitted by petitioner to respondent for approval, be, and they hereby are DISAPPROVED for issuance and use in the State of Missouri."

On petition by appellant to review the decision of the superintendent, the circuit court held a hearing and affirmed the respondent's order holding that respondent's order and decision were based upon competent and substantial evidence upon the whole record, were not arbitrary and capricious, and did not involve an abuse of discretion.

■ The superintendent found a number of internal conflicts between the ART policy itself and the forms and agreements submitted for approval for use with that policy which created a confusing, if not deceptive, situation for the policyholder and formed a basis for disapproval of the forms and collateral agreements. These internal conflicts would, of themselves, require an affirmance of the judgment. However, the important issue in this case concerns the superintendent's disapproval for use in Missouri of the concept of a "termination premium", embodied in the forms, which premium is payable by the in-

sured upon lapse within the first ten years with the promise to pay being secured by posting securities or bank accounts with the company.

The superintendent noted that life insurance policies were traditionally unilateral which means that there is a promise on one side only, the consideration on the other side being executed. 17 C.J.S. Contracts § 8, p. 578. The superintendent found that the effect of the promise to pay a termination premium out of funds not previously paid over to the company as premiums and the posting of collateral to secure that promise converted the policy into a bilateral contract and provided the company with a cause of action against its insured for the termination premium in the event the insured permitted the policy to lapse within the first ten years.

The phrase "termination premium" is somewhat of a misnomer. "An insurance premium may be defined as the agreed price for assuming and carrying the risk—that is, the consideration paid for undertaking to indemnify the insured against a specified peril." 43 Am.Jur.2d, Insurance sec. 530, pp. 555–56. "While the payment of premiums or assessments as specified in the insurance contract is necessary in order to bind the insurer to discharge it's obligations imposed by the contract, it is generally true in the case of life insurance contracts that there is no absolute undertaking to pay the premiums or assessments and, consequently, no personal liability therefor; their payment is usually only a condition precedent to the liability of the insurer, and the insured, if he has not expressly promised to pay, is at liberty to refuse to make the payment. This is true with respect to renewal, as well as original, premiums, and an insured usually has the right to elect whether he will continue to pay the premiums or assessments as they become due under the provisions of a policy of life insurance or whether he will allow the contract to be forfeited." 43 Am. Jur.2d, Insurance sec. 531, p. 531.

■ Assessments aside, an insurance premium is payment for continued coverage and not payment from the insured's own funds in order to terminate coverage.

Neither the briefs nor independent research has revealed any case or text authority supporting the concept of payment by the insured to the company in order to terminate coverage. The evidence offered by appellant was that the CART policy has been approved for use in Michigan, California, New Mexico, Utah, and Minnesota. An actuary of the Iowa Insurance Department testified that this CART policy had been submitted to the Iowa Insurance Department and was not approved because of the termination premium concept. He testified that the termination premium is, in his opinion, a surrender charge and if the concept were given approval it would make the Standard Non-Forfeiture Law (sec. 376.670, RSMo 1969, V.A.M.S.) completely unenforceable as to ordinary life insurance contracts because the laws do not authorize the insurance department to regulate a termination premium. The standard non-forfeiture law does prescribe the maximum amount that an insurance company can retain out of past premiums paid as a surrender charge and requires the payment back to the policyholder of the cash value or the termination premium concept is approved sum upon default in premiums. The standard non-forfeiture law does not apply to annual term policies because those policies do not build up a cash value, but if the germination premium concept is approved for term policies, it could be utilized in ordinary life policies and thereby frustrate the objectives of the standard non-forfeiture law. The Iowa actuary testified that the concept of the termination premium, as embodied in the forms submitted, requires the policyholder not only to pay the premiums which he traditionally must do as his sole obligation, but also to promise to pay something in the future out of his own funds that he has not already given over to the company. The actuary stated that in

his opinion this was not good for the insuring public.

Mr. Boessen, Supervisor of the Life Insurance Section of the Division of Insurance of Missouri, whose primary duties concerned the approval or disapproval of life policies and rider forms, testified. He stated, "The concept of charging a termination premium creates policyholder obligations other than the timely payment of premiums, and this is the only obligation that an insured has in other contracts. And even this is not an obligation, certain results will follow if he does not pay this premium. But, he cannot be sued for breach of contract. And this is a concept that is entirely new, to impose additional obligations on him after he terminates the policy. And I think that this is a sales gimmick. It is designed to permit the use of overly competitive rates. I do not feel that, except for the termination premium provision, that the rates charged are adequate to provide for the proper factors of mortality, proper expenses factor and desired profit margins. Now, if they were, excluding the provision for the termination of premium, there would of course be no need for the termination premium. Yet, the low artificial rates are shown in the policy and used as an unfair inducement to the purchase of insurance. Also, this plan discourages conversion. Now, as desirable as term might be in some cases, there comes a time when many people want to accumulate values to provide them a retirement income and things of this nature. Now, this termination premium, this penalty would tend to discourage a man from conversion, converting his policy at a time when a delay might be extremely costly to him. And well, this is about all that I have under the not in the best interest of the general public."

As to the alleged discrimination in violation of sec. 375.936(7)(a) and sec. 376.500, RSMo 1969, V.A.M.S., Mr. Boessen testified: "There are two types of discrimination that I have in mind. We sell the ART contract with the two inserts stating specified premium rates. Now, there's no penalty charge here. Now, we have an alternate insert for use with the ART contract which provides for lower premiums but yet has a charge for a termination premium penalty. So you do have different rates. If one man buys $100,000.00 of insurance under the old ART policy, and I think they refer to it as a Special, he pays a different rate than someone buying $100,000.00 of insurance on the same contract ART policy, but who purchases a policy containing this DART insert, no, excuse me, it's the C–A–R–T insert. So here you have a man buying the same amount of insurance under the same policy yet he's paying different rates of premiums. One, the lower premium contract being supported by the termination premium. The second area of discrimination I feel is in the collateral being deposited. In the savings account, you have 100% of the value of the termination premium which needs to be secured. In another type of agreement your deposit of 150% of the market value of the securities must equal 150% of the termination premium. You have still another collateral agreement which provides that you don't have to put up 150% of value of the securities, these can be put up on a monthly basis until they reach 150% of the value. Now, I believe in this lateral collateral agreement your entire termination premium is not secured. And I think this is probably for the convenience of the company in selling the shares of this Twentieth Century Fund. But, I do believe that the use of these various collateral agreements constitutes a discrimination in the different types of securities that are necessary to put up in the manner in which they are put up."

As to the title of policy form ART 9–62 misrepresenting the true nature of the policy when the termination premium concept is employed being a violation of sec. 375.936(1), Mr. Boessen stated: "Because the policy holder's commitments under this proposed plan extend beyond his having the option to freely choose to continue or

discontinue the policy on a year to year basis. A policy holder who does continue can do so without penalty. Yet the policy holder who chooses to discontinue it can do so only by incurring a penalty for not maintaining it in force for a longer period of time. So I can't conceive of this as annual renewable term because his commitments extend beyond going through year to year basis. Q. Based upon your ten years' experience in this Division, do you consider that the approval of this termination premium concept would be in the best interest of the policyholders of this state? A. I do not."

■ The superintendent of insurance has the duty to approve or disapprove life insurance contracts and forms and no contract or form may be used in Missouri without the approval of the superintendent. Disapproval of a form is subject to judicial review as provided in chapter 536, RSMo 1969, V.A.M.S., Sec. 376.675, RSMo 1969, V.A.M.S.

Sec. 374.040, RSMo 1969, V.A.M.S., provides, *inter alia,* that: "It shall be the duty of the superintendent of the insurance division . . . to do and perform with justice and impartiality all such duties as are or may be imposed upon him by the laws regulating the business of insurance in this state and to perform those duties imposed upon him in such a manner as to be in the best interests of and protect the general public, policyholders, insurance companies, and the officers, directors and stockholders thereof; . . . ."

In State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S.W.2d 174 (banc 1932), this court held: "The legislative power to authorize, supervise, regulate, and liquidate insurance companies rests on the interests of the public in the insurance business. . . . It is a valid exercise of the police power through administrative officers. State v. Matthews, 44 Mo. 523; State ex rel. Mackey v. Hyde, 315 Mo. 681, 286 S.W. 363, loc. cit. 365. The power was first exercised in 1869 by the enactment of an Insurance Code intended to protect policyholders, stockholders, and the public. Laws 1869, p. 23. The original code and amendments thereto indicate an intention to regulate the business from beginning to end, thereby protecting individual and public interests. The enactment of this comprehensive Code made the state a real party in interest. The superintendent of insurance is the administrative officer in charge of that interest, and the courts are without authority to interfere with his administration of the Code."

And in McWilliams v. Central States Life Ins. Co., 137 S.W.2d 641 (Mo.App. 1940), the court said: "Insurance companies are not regarded as mere private business corporations. On the contrary, they are regarded as quasi-public corporations. The business of insurance is affected with a public interest, so much so that is is subject to the regulatory power of the state. It has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary business of the commercial world. Contracts of insurance are said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of insurance or a credit, the companies being the depositories of the moneys of the insureds, possessing great power thereby, and charged with a great responsibility."

With respect to the right to contract as one pleases, the court held in Orthwein v. Germania Life Ins. Co., 261 Mo. 650, 170 S.W. 885, 889 (banc 1914): "Freedom to contract as one pleases is not an element of the life insurance business, but it is uniformly held (on the solidest grounds of public policy) that the right to make insurance contract is subject to statutory regulation. Dezell v. Fidelity, etc., Co., 176 Mo. [253] loc. cit. 266, 75 S.W. 1102; Burridge v. Ins. Co., 211 Mo. [158] loc. cit. 172–173, 180, 109 S.W. 560."

More recently in Barker v. Leggett, 295 S.W.2d 836, 840 (Mo. banc 1956), the

court said: "The extent to which the statutes comprising the insurance code regulate the insurance business in Missouri and the attitude of the courts with respect to its administration is well stated in State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S.W.2d 174, loc. cit. 177, wherein the court states: 'The original Code and amendments thereto indicate an intention to regulate the business *from beginning to end,* thereby protecting individual and public interests. The enactment of *this comprehensive Code made the state a real party in interest. The superintendent of insurance is the administrative officer in charge of that interest, and courts are without authority to interfere with his administration of the Code.'* This is in harmony with the rule generally recognized as stated in 44 C.J.S. Insurance § 58, p. 526: 'Ordinarily, the courts will not attempt to outline the general policy or conduct of the insurance department or interfere with or disturb the acts of the insurance commissioner or superintendent in matters within his discretionary powers, unless such power is exercised arbitrarily.' "

The scope of review of a decision of an administrative agency is limited. In State ex rel. Chestnut Inn v. Johnson, 297 S.W. 2d 576 (Mo.App.1957), it was stated: "A reviewing court may not substitute its own judgment on the evidence for that of the administrative tribunal, but may only decide whether that tribunal could have reasonably made its findings upon consideration of all the evidence before it."

It seems clear, therefore, that in Missouri the superintendent of insurance had substantial discretionary authority in performing his duties, including the duty to approve or disapprove proposed policy contracts and forms. In the instant case, as noted supra, the principal issue is whether the superintendent exercised this discretionary power arbitrarily in disapproving the CART forms which embodied the so-called termination premium concept consisting of a promise to pay by the insured and posting of collateral to enforce the

promise. The superintendent held that such a practice was not in the public interest and stated his reasons therefor.

The question of whether or not it is in the interest of the general public to allow life insurance companies to secure to themselves the continued payment of premiums on a policy sold to an insured by taking from the insured an assignment of his assets, which assets forfeit to the company if the insured fails to pay premiums when due, is of serious moment and was a proper question for the superintendent to decide.

The effect of the termination premium concept is to convert what has traditionally been a unilateral contract into a bilateral contract. The consequence is to subject the insured to personal liability for nonpayment of a premium and resulting policy lapse, which liability will be satisfied out of funds or assets that have not been paid to the company as premiums. In the instant case those assets would be a bank account or securities. It could be a home, a car, or other assets. The change in the relationship between an insured and the company which would be brought about by the use of the CART forms under consideration is substantial and, in the judgment of the superintendent, contrary to the public interest.

The court holds that it was within the discretionary power of the superintendent, acting for the protection of the general public, policyholders, and insurance companies, pursuant to sec. 374.040, RSMo 1969, V.A.M.S., to disapprove the termination premium practice as embodied in the forms submitted to him, and his disapproval was not arbitrary or capricious.

Appellant argues that the policyholder should be permitted to buy a CART policy and subject himself to the promise to pay a termination premium if he chooses to do so. The same argument can be made for any proposed policy, but the legislature of this state has seen fit to empower the superintendent of insurance to disapprove

and thereby prevent the use of policy contracts which are not in the interest of the general public and policyholder and, to that extent, the right to offer a specific policy contract to the public is restricted.

 It is not for this court to say that to require a policyholder to promise to pay a termination premium and to post security therefor is or is not in the public interest. That is a decision falling within the jurisdiction of the superintendent of insurance who is expected to apply his special expertise in the insurance industry in arriving at a conclusion on the matter. If the evidence reasonably supports the superintendent's findings and conclusions, then his decision is to be affirmed, and the court is not to substitute its own judgment on the evidence for that of the superintendent. State ex rel. Chestnut Inn v. Johnson, *supra*.

The evidence was sufficient to support the findings and conclusions of the superintendent that the termination premium provisions of the forms and the collateral agreements are not in the public interest.

 The superintendent found that the differences in premiums as between the ART policyholder and the so-called CART policyholder constituted a discrimination between individuals of the same class and equal expectation of life in the rate charged, contrary to secs. 375.936(7)(a) and 376.500, RSMo 1969, V.A.M.S. The basic policy for both insureds is the ART policy. The difference between the two insureds deals only with the premiums paid and consideration given to the company. There was sufficient evidence upon which the superintendent could find that the forms submitted allowed and permitted an unfair discrimination between individuals of the same class and equal expectation of life in the rate charged.

The court holds that there was sufficient evidence upon which the superintendent could find the submitted forms were con-

trary to the public interest and permitted acts and conduct in violation of the various provisions of sec. 375.936 noted *supra*.

The judgment is affirmed.

All of the Judges concur.