**AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, Appellant,**

v.

**Joseph P. TEASDALE, Appellee.**

No. 83–1907.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 26, 1984.

Decided May 3, 1984.

Rehearing Denied June 20, 1984.

Robert B. Hoemeke, Michael P. Casey, Richard A. Wunderlich, Lewis & Rice, St. Louis, Mo., for appellant American Family Life Assur. Co. of Columbus.

John Ashcroft, Atty. Gen., William F. Arnet, Asst. Atty. Gen., Jefferson City, Mo., Patrick E. Hartigan, Kansas City, Mo., for appellee.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The American Family Life Assurance Company of Columbus, Georgia, ("American"), a seller of cancer insurance policies in Missouri and throughout the United States, appeals a jury verdict dismissing American's nine-million dollar suit against the former Governor of the State of Missouri, Joseph P. Teasdale. American also appeals the district court's * award to Teasdale of $63,287.21 in attorney's fees expenses, pursuant to 42 U.S.C. § 1988. We affirm the jury verdict and the district court's, 564 F.Supp. 1571, award of attorney's fees.

## I. Facts

On April 24, 1981, American filed a monumental nine million dollar lawsuit against former Governor Teasdale, claiming Teasdale violated its federally protected civil rights (§ 1983), tortiously interfered with its state contractual rights, and uttered injurious falsehoods against it. The suit, filed after Teasdale had lost his re-election bid for Governor, stemmed from a May, 1980, press release issued by Teasdale, in his capacity as Governor. The press release said that Governor Teasdale was directing the Division of Insurance to ban the future sale of cancer policies in Missouri; existing policies were to be left in force. The stated reasons for the directive were: (1) cancer insurance policies, though generally understood by consumers to provide

---

* The Honorable Scott O. Wright, United States District Judge, Western District of Missouri.

broad protection, actually afforded extremely limited payment of benefits—averaging less than 35 cents of every dollar in premiums; (2) sellers of cancer policies employed trickery and deception to lure unsuspecting elderly consumers into purchasing the policies. At the time, one hundred and nine insurance companies were selling cancer policies in Missouri.

On the heels of the press release, the Division issued an order to show cause why cancer insurance policies should not be prohibited. After conducting hearings, the Division, on November 3, 1980, issued a cease and desist order, withdrawing approval of all cancer insurance policies in Missouri. In early 1981, Teasdale's term as Governor ended and the newly elected administration took over. This new administration did not oppose the efforts to have a state court overrule the November 3, 1980 cease and desist order. Without conducting any adversarial proceeding or making any findings of fact, the state court issued a one page consent decree lifting the cease and desist order of November 3, 1980.

In its complaint, American alleged Teasdale knew he was without statutory or constitutional authority to direct the ban on the sale of cancer insurance, but he did so anyway as part of a politically motivated propaganda scheme. The press release allegedly led the public to brand all cancer insurance sellers as culprits and caused the Division to hold biased and perfunctory hearings—bluntly referred to by American as "sham hearings". As ground for relief, American claimed the press release deprived it of its property rights without due process, tortiously interfered with its contractual relations with policyholders, and severely damaged its business reputation.

Teasdale responded by filing a motion for summary judgment dismissal of the complaint, asserting a qualified good faith immunity defense. On November 24, 1981, the district court denied Teasdale's motion, holding that there were material factual issues concerning whether Teasdale "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [plaintiff] or ... took the action with the malicious intention to cause a deprivation of constitutional rights or other injury". *Quoting Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).

Subsequently, American conducted sweeping discovery; it deposed every defense witness, served motions for production of voluminous documents, and served a set of interrogatories and four sets of requests for admissions on Teasdale. With some reluctance, the district court allowed this extensive discovery to continue because American's attorneys represented that it was needed to uncover evidence of Teasdale's bad faith. Just prior to trial, the court concluded that American's persistent and probing discovery efforts "failed to uncover any of [former Governor Teasdale's] bad faith". The district court nevertheless indulged this absence of proof, accepting American's assurances that during trial it could adduce evidence of Teasdale's bad faith.

American's trial strategy focused on attempts to show: (1) the press release caused it to suffer enormous financial losses, and (2) Teasdale acted in bad faith. As to the first aspect, American tried to demonstrate, principally through testimony of its own corporate officers, that Teasdale's press release led policyholders to cancel existing policies or permit them to lapse, causing premiums and profits to plummet. American's key witness, Senior Vice-president Frank Kimbrough, conceded that he could not say why Missourians cancelled policies or allowed them to lapse since American undertook no customer surveys. Kimbrough also acknowledged that American had experienced a significant downturn in premiums before the press release. The former customers testifying about their lapsed policies almost uniformly admitted that they were unaware of the press release and that it had no effect on their decisions not to renew. Only a couple of customers stated that the press release had "some bearing" on their decision not to

renew. An actuary, who had previously testified for American in various other court actions, testified that American suffered sales losses between 1980 and 1982. Like Kimbrough, however, he was both unable and unqualified to offer reason(s) why premiums dropped and cancellation and lapses rose. In its closing argument, American—apparently recognizing it had not supported a claim for any actual and punitive damages, let alone a claim for nine-million dollars—merely asked the jury to return a nominal sum against Teasdale because of his alleged bad faith.

In attempting to demonstrate Teasdale's bad faith, American focused almost entirely on Teasdale's admission that he knew the contents of the news release and was aware that Missouri insurance laws required a hearing prior to any attempt to revoke approved policy forms. Teasdale took the position that he had the authority, as chief executive officer of the state, to order the Division to take necessary steps to prohibit the sale of cancer policies. Teasdale also admitted that he gave speeches, after the press release, stating he had ordered the Division to ban the sale of cancer insurance.

Perhaps more revealing than any other aspect of American's case were the frank admissions of its key witnesses as to why suit was brought against Teasdale. American's Senior Vice-president Kimbrough and Chief Financial Officer Jeter testified, on cross-examination, that five states had either banned entirely or severely restricted the sale of cancer policies. In March, 1980, a comprehensive 292 page congressional committee report, entitled "Cancer Insurance: Exploiting Fear for Profit", leveled scathing criticisms against the cancer insurance business for atrociously low loss ratios and generally deceptive selling practices. Jeter admitted that American's own *loss ratio over the next thirty years would* not rise above 56%, sharply contrasting with the 80% to 90% loss ratios experienced by general health insurance providers. Kimbrough and Jeter also acknowledged that, following the adverse congressional report, American filed numerous lawsuits, similar to this one, against its various public critics, including a congressional investigator, the American Broadcasting Company, the *Changing Times* magazine, and a former insurance commissioner in Pennsylvania. Kimbrough candidly admitted that these suits, none successful on the merits, were part of American's hard-nosed policy that "anyone who does not take American Family seriously is a fool and should be fully prepared to legally defend its position". This policy may have entailed filing frivolous lawsuits against critics.

After American completed its three day case-in-chief, the district court told the parties, outside of the jury's presence, that, while Teasdale was entitled to a directed verdict, it would allow the case to proceed. Teasdale and his numerous defense witnesses then presented testimony detailing the events and factors leading to the press release. Two of Teasdale's administrative assistants testified that, from the beginning of his term, Teasdale sought to implement a more consumer-oriented regulatory policy with respect to the insurance industry. As part of that policy, Teasdale's administration investigated and attempted to correct abuses in various areas in the insurance business. Teasdale's consumer affairs director testified that as early as 1978, the Division of Insurance had supplied the Governor with information regarding abusive and deceptive practices employed in the sale of cancer insurance policies in Missouri.

Governor Teasdale's chief of staff testified that the Governor conducted numerous staff meetings to discuss the abuses in the sale of cancer policies. During these meetings, the Governor and his staff reviewed the reports of two congressional committees, the Federal Trade Commission, the Massachusetts Division of Insurance, and the Missouri Division of Insurance. Those reports collectively documented that the cancer insurance business had experienced extremely low loss ratios and had employed various deceptive and misleading sales tactics. Key Teasdale staff members testified that, after reviewing these reports, they

advised the Governor to direct the Missouri Division of Insurance to prohibit the sale of cancer policies in the state. Governor Teasdale's legal counsel advised him that he had the authority, as chief executive of the state, to direct a division head to take action when evidence was presented showing a violation of state law.

Teasdale testified that, based upon the various reports detailing abuses, the recommendations of his staff, and the advice of his legal counsel, he decided that he had to act to protect the citizens of the state from cancer insurance sellers' widespread abuses in the sale and marketing of cancer insurance. He therefore exercised his discretionary authority as governor and chief executive of the state to direct the Division to ban the sale of cancer policies in Missouri.

The former Director of the Division of Insurance testified that even before former Governor Teasdale directed the Division to take action, the Division had already decided to issue a cease and desist order prohibiting the sale of cancer policies, based upon the documented abuses by cancer insurance policy sellers. Both the former Director and former General Counsel of the Division of Insurance testified that all cancer insurers named in the cease and desist order, including American, were given a full and fair hearing after they requested them; Teasdale's administration did not interfere with these hearings.

After Teasdale's defense, the trial judge told the parties, outside of the jury's presence, that Teasdale was entitled to a directed verdict because American had failed to prove a case under any three of its claims. Characterizing American's suit as frivolous, the Court reluctantly submitted the case to the jury, but told the parties he would set aside any jury verdict in favor of American. The jury took less than one hour and fifteen minutes to return a verdict in favor of Governor Teasdale on all three counts. Later, the district court, finding the suit was "frivolous", "vindictive" and "vexatious", awarded Teasdale attorney's fees and expenses in the amount of $63,287.21.

## II. Jury Instruction

In the trial court, American's due process argument went as follows: American claimed legitimate entitlement, under Missouri law, to sell approved cancer insurance policies in Missouri. Under Missouri law, the Division could issue a cease and desist order prohibiting or banning the sale of cancer policies, but only after American was given a fair and impartial hearing and the Division determined that there was competent and substantial evidence that a subject company had violated the insurance laws of Missouri. *See* Mo.Rev.Stat. § 374.-046. American claimed Teasdale was without legal authority to ban the sale of insurance. Allegedly, however, Teasdale's press release—directing the Division to prohibit the sale of insurance—was interpreted by the public as a ban on the sale of cancer insurance, thereby tainting American's business good will and crippling its sale of policies in the state. Thus, according to American, Governor Teasdale, in issuing the press release, knew or reasonably should have known that he was depriving American of its constitutionally protectible property interest—i.e., its right to sell cancer policies—prior to the statutorily required hearing before the Division. American further asserted that the Governor's directive precluded the Division from granting American a fair and impartial hearing prior to issuance of the cease and desist order.

Teasdale's good faith immunity defense to this claim was that he reasonably believed he had the discretionary authority, as supreme executive of the state, to direct the Division to issue a cease and desist order. American urges that the jury could not properly evaluate the objective reasonableness of Teasdale's purportedly erroneous belief that he had such authority unless the trial court instructed that: (1) Teasdale lacked the legal authority to direct the Division to issue a cease and desist order; (2) the Insurance Division had the

authority to issue a cease and desist order but only after a fair and impartial hearing adduced "competent and substantial" evidence that the subject company had violated the law. Without these jury instructions, American asserts, the jury erroneously assumed Teasdale acted within the scope of his lawful authority and, therefore, improperly rejected American's due process claim. American points to the court's instruction to the jury that it should presume, until the evidence showed the contrary, that Teasdale obeyed the law, and that if he acted within his lawful authority, then there could be no due process violation. Thus, American claims the trial court committed prejudicial error in refusing to give the proffered instructions on Teasdale's lack of authority.

We conclude that there was no error in the jury instructions, and the district court properly found that the evidence warranted a directed verdict against American. *See Windsor Corp. v. Miller,* 309 F.2d 68, 69 (1st Cir.1962).

 First, American failed to adduce any credible evidence that Teasdale's press release deprived it of any tangible property interest without due process of law. American alleges on appeal, as it did in its complaint, that sales dropped and cancellation rose after the press release, but during trial it completely failed to demonstrate that these losses were traceable to the objectionable press release. Nor was American even able to show that the public generally understood the press release as a final determination that American was "guilty" of wrongdoing and therefore "prohibited" from selling cancer policies in the state. However, even if American were stigmatized by the press release, this alone does not constitute such a property or liberty deprivation as to trigger federal due process protections. Under the "change in legal status" test enunciated in *Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976), the offending state action—in this case the press release—must deprive the stigmatized party of a right to a benefit previously held under state law. *See also Hughes v. Whitmer,* 714 F.2d 1407, 1417 (8th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). American clearly did not demonstrate that its right or ability to sell cancer policies in the state was deprived by virtue of Teasdale's press release.

Of course, the subsequently issued cease and desist order did deprive American of its right to sell cancer policies. However, this order was made only after the Director of the Division, closely following procedures set forth in Mo.Rev.Stat. § 374.046, afforded American a fair and impartial hearing and determined, based upon what was considered "substantial and competent" evidence, that American was violating the law.[1] The former Director of the Division testified that American was given a fair and impartial hearing and that Teasdale's administration did not attempt to improperly influence the Division's independent judgment. In fact, even prior to Teasdale's press release, the Division had determined to seek a cease and desist order against the entire cancer insurance industry based upon various reports documenting widespread abuses and deceptive selling practices.[2] The rebuttal evidence American produced at the hearing was, in the Director's views, simply unable to overcome the overwhelming weight of the evidence showing widespread abuse. American offered absolutely no support for its conclusory and derogatory assertion that

---

1. American does not and indeed cannot tenably urge that the procedures set forth in Mo.Rev. Stat. § 374.046, which govern the issuance of cease and desist orders, are constitutionally defective. Those procedures clearly provided "an opportunity to be heard 'at a meaningful time and in a meaningful manner'". *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). (Citation omitted).

2. The Director's authority to issue the cease and desist order of May 16, 1980, against the various cancer insurance companies was provided by Mo.Rev.Stat. § 374.010, .040, .046 and § 376.405, .777(7). *See also Survivors Benefit Insurance Company v. Farmer,* 514 S.W.2d 565, 575–76 (Mo.1974).

the hearings before the Division were "a sham" and that the Division's order was devoid of support and dictated by the caprice and whim of former Governor Teasdale.[3]

■ As an additional ground for rejecting American's challenge to the jury instructions, we, like the district court, conclude that Teasdale was entitled to a directed verdict based upon his qualified good faith immunity defense. *Cf., Prebble v. Brodrick*, 535 F.2d 605, at 613. First, the record clearly reveals that Teasdale's announced directive was not taken in bad faith or with the intention of depriving American of its due process rights, but rather with the welfare of the citizens of Missouri in mind. Various comprehensive reports documented widespread abuses by the cancer insurance industry to the detriment of Missouri consumers. After reviewing these reports, Teasdale's key administrative assistants, and the Director of the Division of Insurance, recommended that steps should be taken to prohibit the sale of cancer insurance policies in Missouri. Second, Teasdale was advised by his staff assistants and by his legal counsel that they had the legal authority to issue a press release directing the Division to take action; the former Director of the Division also agreed that he had such authority. Finally, Teasdale testified that he believed his directive was taken pursuant to his discretionary executive authority and with the best interest of Missourians in mind. In view of the foregoing, it is clear that Teasdale "neither knew nor had any reason to know that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1983).

We should add that, despite American's claims to the contrary, it is far from well settled or clear that Governor Teasdale lacked the legal authority to direct the Director of the Division to take steps to issue a cease and desist order against insurance sellers believed to be violating the laws. During trial, Teasdale steadfastly maintained that he had such authority and the district court apparently agreed. The Missouri Constitution vests supreme executive power in the Governor, who is charged with the duty to "take care that the laws of this state are fully executed by the executive branch". Art. IV §§ 1 and 2, Mo. Const. (1945). The Division of Insurance is charged with the execution of the insurance laws. Mo.Rev.Stat. § 374.010 (1978). The Division, however, is part of the Department of Consumer Affairs, Regulation and Licensing (DCARL), which, in turn, is part of the executive branch; and the Directors of both the Insurance Division and DCARL are appointed by the governor, with the advice and consent of the Senate. Mo.Rev.Stat. § 620.010(1) and (10) (1978); Art. IV §§ 12 and 51, Mo. Const. (1945) (Vernon 1984 Suppl.); *see also* Mo.Rev. Stat. § 374.020(1) (1978). The Director of Insurance is subject to removal from office by the Governor at his pleasure. Mo.Rev. Stat. § 374.020(1). There is no constitutional or statutory provision[4] or Missouri

---

3. American suggests that the state court's one page decision lifting the cease and desist order supports its claim that it was denied a fair and impartial hearing. This claim is frivolous. First, the state court never dealt with the issue of a fair and impartial hearing. Second, the state court's decision was made pursuant to a consent agreement between the new governor's administration and American; no adversial proceedings were ever conducted and no supporting finding of fact and conclusions of law were made. Thus, the state court's order is entitled to little, if any weight. (*See* district court memorandum opinion 564 F.Supp. at 1574, note 2.).

4. American makes passing reference to the Reorganization Act of 1974 (Mo.Rev.Stat. Appendix B (1978)), which provides that power, duties, and function vested in the Insurance Division "are transferred by a Type II transfer to the department of consumer affairs, regulation and licensing" and that "[s]upervision by the director of the department under a Type II transfer [i.e., DCARL] shall not extend to substantive matters relative to policies regulative functions or appeals from the decisions of the transferred ... division ... unless specifically provided by law." § 4(10) and § 1(7)(1)(b). Despite American's broad reading, these provisions do not purport to limit the Governor's

case [5] indicating that the Governor, in his capacity as chief executive of the state, is without the authority to direct the Division of Insurance to take action to prohibit the sale of cancer insurance, where, as here, the Governor has good reason to believe that an insurance seller is violating the insurance laws and its operations are detrimental to the best interest of the public.[6]

We, like the district court, reject American's contention that Mo.Rev.Stat. § 374.-046 deprives the Governor of authority to direct the Division to take action. As mentioned above, § 374.046 provides that the Director of the Division may, as he did here, issue a cease and desist order against a company whenever it believes there is "competent and substantial" evidence that an insurance company has violated the law. If it so requests, the subject company will receive a hearing at which it can show cause why the order should not be issued. § 374.046(2)(b) & (d). And, the subject company may seek judicial review of the order in Cole County Circuit Court. § 374.-046(2)(g). However, nothing in § 374.046 indicates that the Division is precluded from issuing a cease and desist order simply because the Governor has so advised.

And, the fact that the Governor has directed the Division to take steps to issue such an order does not render the Division unable either to provide the subject company with a fair hearing or to make an independent determination of wrongdoing based upon competent and substantial evidence.[7]

■ Finally, in view of American's inability to point to any clear expression of state law prohibiting the Governor from directing the Insurance Division to take remedial action, we think the district court gave instructions which adequately and fairly stated plaintiff's due process theory of recovery. At American's request, the court instructed the jury that American was entitled to a verdict if the jury found that: 1) Teasdale knowingly issued the press release stating that he had ordered the Division to prohibit the sale of cancer insurance; 2) Teasdale knew or reasonably should have known that the press release would deprive plaintiff of its property rights without due process by interfering with American's right to a fair and impartial hearing; and 3) as a direct and proximate result of Teasdale's actions, plaintiff was damaged.[8] As we have discussed

executive authority to direct the Division to take action against those believed to be violating the insurance law.

**5.** American relies on *Theodoro v. Department of Liquor Control,* 527 S.W.2d 350, 354 (Mo. banc 1975) to support its claim that Teasdale lacked authority to direct a department head to take remedial action. *Theodoro* simply held that a governor could not order the supervisor of liquor control to set aside its decision revoking a license. Nothing in *Theodoro* can be interpreted as a restriction on the Governor's power to direct a department head to take action to stop a violation of the law known to the Governor and the division head.

**6.** Where there is no state court precedent, ordinarily we will give substantial weight to the interpretation of the district court judge who sits in the *lex loci* state. *Bishop v. Wood,* 426 U.S. 341, 346 n. 10, 96 S.Ct. 2074, 2078 n. 10, 48 L.Ed.2d 684 (1976); *Hughes v. Whitmer,* 714 F.2d at 1415 n. 5.

**7.** In urging Teasdale's lack of authority, American again relies on the state court's decision lifting of the cease and desist order. However, the state court's one page consent order ad-

dressed neither whether Teasdale exceeded his executive authority nor whether American was denied a fair hearing. In fact, the state court conducted no adversial proceedings and made no supporting findings of fact or conclusions of law. (*See* footnote 2, *supra*).

**8.** Instruction No. 9 given to the jury was as follows:

"Your verdict must be for plaintiff on [its due process claim] if you believe:

First: Defendant knowingly issued a press release on May 12, 1980, which stated that defendant ordered the Division of Insurance to prohibit the sale of cancer insurance within the State of Missouri; and

Second: Defendant knew or reasonably should have known that his issuance of the press release would deprive plaintiff of its property without due process of law by interfering with plaintiff's right to a fair and impartial hearing; and

Third: Defendant knew or reasonably should have known that the publication of the press release of May 12, 1980, would deprive plaintiff of its property without due process by interfering with plaintiff's right to a fair and impartial hearing on whether or not its

above, American did not establish either the second or third elements of this instruction.

### III. Evidentiary Errors

#### A. Testimony of Morton Paulsen

■ Teasdale was permitted to cross-examine, without objection by American, American's key witnesses Kimbrough and Jeter about American's multimillion dollar suit against *Changing Times* Magazine for its article criticizing cancer insurance companies. Kimbrough testified that the suit had been settled. Later, Teasdale called Morton Paulsen, the reporter who wrote the article, to testify about the various reports he reviewed before writing the article and about the lawsuit American filed against him and *Changing Times*. Paulsen was permitted to testify, over American's objections, concerning the various settlement negotiations, offers tendered and rejected, and final settlement terms. Paulsen specifically testified that American had surrendered its multimillion dollar suit in exchange for the publication of a one paragraph letter-to-the-editor; and that the magazine refused to settle on any terms, but published the letter as a matter of course and would have done so regardless of the suit. American claims Paulsen's testimony about the article and suit was irrelevant and highly prejudicial and thus should have been excluded under Fed.R. Evid. 408.

The district court clearly did not abuse its broad discretion in admitting Paulsen's testimony. Paulsen's testimony regarding the *Changing Times* suit was relevant and admissible for the purpose of showing the hostility American and its key witnesses harbored toward anyone who was critical of its product. *United States v. Gambler*, 662 F.2d 834, 839 (D.C.Cir.1981). Further, Kimbrough and Jeter had already testified on cross-examination, without American's

approved policy forms should be withdrawn; and

Fourth: Defendant's new release of May 12, 1980, interfered with plaintiff's right to a fair and impartial hearing; and

objection, about the four lawsuits, including one against *Changing Times*, that were filed against those who criticized American. Paulsen's testimony served to rebut Kimbrough's testimony that American's suit against *Changing Times* was "settled". Finally, Paulsen's testimony about the suit and the various critical reports he used in writing the article was relevant to rebut American's claim that its sales dropped solely because of Teasdale's press release.

#### B. Excluded rebuttal testimony of William McCaskell

■ The district court refused to permit American to call, as a rebuttal witness, William McCaskell, the Director of the Missouri Division of Insurance in 1971, during Governor Warren Hearnes' term. Presumably, McCaskell would have testified: (1) while serving as Director, he was never ordered by Governor Hearnes to issue a cease and desist order; (2) before issuing a cease and desist order, he would have consulted Mr. Mullen, the former superintendent of the Division, and Mr. Chase, the supervisor of the consumer complaints section. American claims McCaskell's proffered testimony was needed to rebut Teasdale's testimony that he had the authority to direct the Division to ban the sale of cancer insurance and former Director Frederick's testimony, on cross-examination, that he did not find it necessary to consult with subordinates Mullen or Chase before issuing the cease and desist order.

The district court properly disallowed the proffered rebuttal testimony of McCaskell; such testimony was not relevant to explain, repel, or disprove any evidence presented in the defendant's case-in-chief. Teasdale's own witnesses admitted, on cross-examination, that Governor Hearnes never directed the Division to issue a cease and desist order. And McCaskell's practice of consulting particular subordinates before issu-

Fifth: As a direct and proximate result of defendant's actions, plaintiff was damaged.

ing a cease and desist order reflected neither a statutory requirement nor a benchmark for judging the reasonableness or propriety of the May, 1980 order issued by Director Frederick.

## IV. Award of Attorney's Fees

### A. Vindictive and frivolous nature of suit

The district court found that American's lawsuit was "vindictive" and "frivolous", awarding Teasdale attorney's fees and expenses in the amount of $63,287.21. The court emphasized that American brought the suit to harass and attack the integrity of former Governor Teasdale. American claims the district court's award of fees was erroneous since American established a *prima facie* case under its three theories of recovery. Rehashing its arguments challenging the jury instructions, American makes the rather extraordinary claim that it proved Teasdale's press release deprived it of its property interest—in selling and maintaining policies—without due process of law. American finds special comfort in the district court's denial of Teasdale's motion for summary judgment.

We believe the district court acted within its discretion in awarding attorney's fees and expenses to Teasdale under 42 U.S.C. § 1988, based upon its well-supported findings that American's suit was frivolous, unfounded, and vexatiously brought and pursued. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, 48 n. 2 (1983); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978); *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). First, as discussed above, American was unable to produce any admissible evidence supporting its claim that Teasdale's press release caused American to suffer tangible injury. Apparently recognizing this and probably fearing

an "abuse of process" suit by Governor Teasdale, American surrendered its claims for damages during closing argument. As the district court aptly stated, "[American] sought a nominal verdict in order to defend any future lawsuit and to blunt any grounds for an attorney's fee award". Second, American was unable to produce a scintilla of evidence showing Teasdale's bad faith, despite its repeated representations to the court that it could do so through extensive discovery and during trial. Even if American initially believed it could support the sweeping allegations of Teasdale's bad faith, it continued to litigate the suit after it became apparent that its claims were groundless and unreasonable. *Christiansburg*, 434 U.S. at 422, 98 S.Ct. at 700. The district court permitted the case to proceed to trial only because, accepting the purported good faith representations of American, the court thought it would be prudent to let the jury hear and decide the question of Teasdale's intent. After the verdict was rendered, several jurors stated publicly that the suit was "frivolous".

There is also support in the record for the district court's finding that American *initiated* the suit in bad faith, with the sole purpose of harassing Teasdale and attacking his integrity.[9] The testimony of American's own key witnesses revealed American's policy of filing baseless lawsuits against any person who publicly criticized the business practices of cancer insurance companies. American clearly wanted to punish past critics and silence future critics, regardless of the well-founded bases for their criticisms. Teasdale became the unfortunate subject of American's wrath when he, seeking to protect the citizens of Missouri, joined numerous other public officials in denouncing cancer insurance companies for their low loss ratios and deceptive selling practices. Of the one hundred and nine insurance companies selling cancer policies in Missouri, American was the

9. The court in *Christiansburg*, 434 U.S. at 421, 98 S.Ct. at 700 recognized that a court could, in its discretion, award fees "upon a finding that the plaintiff's action was frivolous, unreason-able, or without foundation, even though not brought in subjective bad faith." We address American's bad faith, however, as an additional grounds justifying the award of fees here.

only company who filed suit against Teasdale because of the press release. Yet American never sought to enjoin the executive branch from proceeding during the period when its civil rights were allegedly being intentionally and/or recklessly violated. Moreover, despite claiming nine and one half million dollars in actual and punitive damages, American never undertook any reasonable effort to establish that monumental claim or to establish a causal connection between the press release and American's purportedly falling sales. As mentioned above, American conducted no surveys of customers to find out the reason why they let their policies lapse. American's failure in this regard may have been self serving since the customers who did testify almost uniformly admitted the press release had no bearing on their decision not to renew.

It thus appears that American's multimillion dollar lawsuit was designed not to vindicate its legal rights, but to expose Teasdale to public obloquy, harassment, and the enormous financial and emotional hardships of defending groundless charges that he misused his public office for personal gain. However, Teasdale was not the only victim; the entire public inevitably suffers when a vindictive plaintiff squanders limited judicial resources by prosecuting frivolous lawsuits. Unfortunately, typically weighty financial and ethical concerns did not serve to deter American, an untypical civil rights plaintiff, from burdening the judiciary with a frivolous lawsuit. As noted in *Christiansburg*, 412 U.S. at 422, 98 S.Ct. at 701, "[i]f a plaintiff is found to have brought or continued such a claim in *bad faith*, this will be an even stronger basis for charging him with the attorney's fees incurred by the defense."

### B. Amount of fees and expenses

■ American raises two objections to the amount of the fees and expenses awarded. First, American claims the court erred in reimbursing the state for the time spent by three Missouri Assistant Attorney Generals in defending Teasdale. In sup-

port, American argues that Teasdale was not contractually obligated to pay these attorneys, who were full-time salaried employees of the state. This contention is frivolous. It is well established that a publicly funded legal organization representing a prevailing party in a § 1983 suit can recover attorney's fees under § 1988. *Washington v. Seattle School District No. 1*, 458 U.S. 457, 487–88 n. 31, 102 S.Ct. 3187, 3204 n. 31, 73 L.Ed.2d 896 (1982); *Oldham v. Ehrlich*, 617 F.2d 163, 168–69 (8th Cir.1980); *Watkins v. Mobile Housing Board*, 632 F.2d 565, 567 (5th Cir.1980). There is no sensible basis for treating the Missouri Attorney General's Office, which represented former Governor Teasdale, any differently from other publicly funded legal organizations. Moreover, although Teasdale's own privately retained attorney was awarded fees, the record supports the district court's finding that the time spent by the state's attorneys did not represent a duplication of effort.

■ Second, American contends the district court abused its discretion in awarding the actual expenses incurred by the state for costs of bringing witnesses to testify. It specifically contends that various witnesses' live testimony was unnecessary and that their expenses should have been limited to a $30.00 per day witness fee, a $50.00 total subsistence allowance, and $25.00 to cover travel expenses under 28 U.S.C. §§ 1821 and 1920. We believe the district court acted within its discretion in rejecting American's contention that various witnesses' live testimony was unnecessary. Moreover, there is no support for the contention that 28 U.S.C. §§ 1821 or 1920 limits the travel expenses to a maximum of $25.00. In fact, 28 U.S.C. § 1821(c) provides that actual travel costs of witnesses are covered. Nor does § 1821(d) provide that a witness is entitled to only one payment of $50.00 for subsistence; instead § 1821 suggests that if a witness must attend a trial for two days, a $50.00 per day subsistence is allowed. And, under § 1821(b), the $30.00 per day witness fee applies to one day of testimony and at least one travel day. Considering the foregoing,

the court's award of actual witness expenses incurred is less than what it could have awarded under the *per diem* provisions of 28 U.S.C. § 1821. Thus, American has no cause to complain.

■ Finally, the court properly awarded the state its out-of-pocket expenses incurred in preparing for and conducting litigation. These expenses included the costs of consulting experts necessary to meet the opponent's case.

### V. Conclusion: Appellate Fees and Costs

We conclude, after careful consideration, that American's numerous claims on this appeal were frivolous and unreasonable. This appeal has served only to prolong the plight of Teasdale and needlessly burden and inconvenience the judiciary. We therefore assess attorney's fees and costs against American in connection with this appeal. *Compare Middleton v. Remington*, 594 F.2d 1210, 1213 (8th Cir.1979). Appellee is requested to submit a verified itemization of costs and expenses together with application for attorney's fees in connection with this appeal.