**Bernadette SCELTA, Plaintiff,**

v.

**DELICATESSEN SUPPORT SERVICES, INC., et al., Defendants.**

**No. 8:98CV2578–T.**

United States District Court, M.D. Florida, Tampa Division.

April 10, 2001.

Order Denying Reconsideration, May 25, 2001.

David P. Montgomery, The Montgomery & Walch Law Firm, Bradenton, for plaintiff.

Mitchell C. Robiner, Ruden, McClosky, Smith, Schuster & Russell, P.A., Kenneth George Turkel, Williams, Schifino, Mangione & Steady, P.A., Tampa, FL, William G. Salim, Jr., Moskowitz, Mandell, Salim & Simowitz, P.A., Ft. Lauderdale, FL, Jacqueline G. Veit, Martin S. Hyman, Golenbock, Eiseman, Assor & Bell, New York City, for defendants.

## ORDER

THOMAS G. WILSON, United States Magistrate Judge.

The defendants, who prevailed on the plaintiff's claims of sex discrimination, seek an award of their attorneys' fees and costs on those claims (Docs.154, 155).[1] Unquestionably, the discrimination claims that were presented to the jury were frivolous and thus the defendants are entitled to an award of attorneys' fees and costs against the plaintiff. Moreover, because plaintiff's counsel unreasonably and vexatiously multiplied the proceedings by recklessly asserting the frivolous claims, the defendants are entitled to recover fees and costs from him under 28 U.S.C.1927. However, attorneys' fees and related expenses will be awarded only from, and after, the time of the pre-trial conference.

### I.

The plaintiff is a former employee of the defendant companies. She was hired in

---

1. In accordance with the parties' stipulation, this order only addresses whether the defendants are entitled to recover attorneys' fees (Doc. 162).

1993 as an administrative assistant and was a sales information analyst when her employment with the defendant companies ended in October 1997. The plaintiff stated in an application for unemployment benefits that she resigned because she did not receive a promised salary increase. She later supplemented that application, alleging that she quit because she was sexually harassed. She filed charges of sex discrimination with the Florida Commission on Human Rights ("FCHR") and the Equal Employment Opportunity Commission ("EEOC") in July 1998.

After receiving a right-to-sue letter, the plaintiff filed a lawsuit against the defendants asserting, among other things, claims of sexual discrimination in violation of both the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(1), and Title VII, 42 U.S.C.2000e–2(a), as well as a claim of battery (Doc. 2).[2] The battery count alleged that defendant Robert Martin attempted to put his hands down the plaintiff's dress. The discrimination claims seemed to allege sexual harassment based upon (1) sexual comments and conduct by Martin and (2) adverse job action taken against the plaintiff by Joseph Egan, her former supervisor, in order to conceal a consensual affair between the plaintiff and Egan (*id.* at ¶¶ 18.1–18.5; 18.9; 18.12; 18.13; 17; 22).[3] The parties subsequently consented to the exercise of jurisdiction by a United States Magistrate Judge (Doc. 110).

At the pre-trial conference, Plaintiff's counsel indicated that the case was primarily a hostile work environment sexual harassment claim. Thus, there was the following exchange (Doc. 122, p. 14):

| The Court: | … the guts of it is a hostile work environment. |
|---|---|
| Mr. Montgomery: | Yes, Your Honor. |
| The Court: | *Comments and stuff like that.* |
| Mr. Montgomery: | Mm-hmm. |

Plaintiff's counsel elaborated that "the sexually hostile work environment [regarded] comments about my client's body," and that rumors of the alleged affair between Egan and the plaintiff precipitated "a lot of the sexual comments and the batteries" because the affair "tainted [the plaintiff] as being fair game to be hit on by men in the office" (Doc. 122, pp. 10, 11, 13; *see also* Doc. 97, p. 3 ("after the rumors [of the affair] Martin subjected the plaintiff to a 'barrage' of sexual comments and gestures")).

The plaintiff also asserted at the pre-trial conference that she suffered adverse job action because she had an affair with Egan (*id.* at pp. 8–9). Plaintiff clarified, however, that any adverse job action was "not because she was a woman[,] but because she had the affair with Joe Egan" (*id.* at p. 8). Plaintiff obscurely referred to this theory as "circling the wagons" (*id.* at p. 9). Nonetheless, plaintiff's counsel stated that "circling the wagons…[was] not the crux of [her] case" but simply additional evidence of sexual harassment (*id.* at p. 9). Consequently, the case was understood, at the time of the pre-trial conference, to be a hostile work environment sexual harassment claim.

However, on the eve of trial, there was an apparent enlargement of the plaintiff's theories. In response to the defendants' *in limine* argument that adverse job action as a consequence of an affair is not

---

**2.** The district court dismissed the plaintiff's other allegations of intentional infliction of emotional distress, intentional interference with an advantageous business relationship, and negligent retention and supervision (Doc. 41).

**3.** Egan denies that he had an affair with the plaintiff. For the purposes of this motion, the allegation is assumed to be true.

actionable, the plaintiff asserted that the defendant companies took adverse action against her based on gender. In this connection, the plaintiff contended that the defendant companies had an "anti-affair policy," which was discriminatorily enforced against the plaintiff in order to protect Egan, the male participant in the affair. The plaintiff seemingly alleged that this disparate treatment took the form of a "conspiracy" between Egan and Annarita Nora, the plaintiff's former supervisor, to convince the plaintiff to quit her job by denying her, among other things, computer training and a salary raise. The plaintiff asserted that this conspiracy culminated in her termination.

The defendants complained that the plaintiff had not mentioned an "anti-affair policy" in the complaint, in the pre-trial statement, or at the pre-trial conference. Despite misgivings, I allowed the plaintiff to present this theory at trial.

With respect to the plaintiff's hostile work environment claim, the plaintiff did not present at trial a "barrage" of sexually disparaging comments and gestures. Rather, the plaintiff's trial testimony specified six alleged incidents of harassment during a sixteen month period by Martin. In this regard, she asserted that:

(1) In February 1996, during an after-hours work-related event, Martin allegedly commented on the size of her breasts and touched the skin above her cleavage;

(2) In February 1996, Martin called her at home, and, after the plaintiff told him she was preparing to take a shower, Martin allegedly asked her, while on a speaker phone, either whether her breasts were bare or whether she had a bra on;

(3) In April 1996, at an after-hours dinner, the plaintiff said that Martin remarked about her breast size;

(4) In March 1997, Martin commented that she had "luscious knockers;"

(5) In April 1997, Martin commented at an after-hours dinner that the total weight of the breasts of the plaintiff and two other employees exceeded his wife's body weight;

(6) In June 1997, Martin came into her office and grabbed his groin and made a comment about his penis.

Importantly, on cross-examination, the plaintiff testified that these incidents did not impair her ability to work. The plaintiff further stated that she was not offended by off-color remarks and swearing, and that she engaged in such banter while working for the defendants. The plaintiff also testified that she would not have resigned her position if the defendant companies had given her a raise and more computer training.

At the close of the plaintiff's case, the defendants moved for judgment as a matter of law (Doc. 153). In accordance with my usual practice, the case was allowed to go forward. However, I warned plaintiff's counsel that "you should not take anything from that I see any merit in this case" (*id.* at p. 8). The plaintiff was told that the "case is going nowhere fast" and, in all likelihood, the sexual discrimination claims would be "throw[n] our" in the event of a plaintiff's verdict (*id.* at p. 9). The plaintiff was then cautioned about the potential for an award of attorneys' fees against her, and the parties were advised to discuss settlement.

The plaintiff, however, did not settle this matter, and the case proceeded with the defendants' evidence. Thereafter, plaintiff's counsel argued at closing that the "main reason" for the suit was the claim concerning the affair. He discussed that contention for forty-seven of the fifty-two minutes he used during his primary closing argument.

After a six-day jury trial, the jury quickly returned a verdict for the defendants on all of the plaintiff's claims. Thereafter, the defendants timely filed a motion for their attorneys' fees and costs pursuant to 42 U.S.C.2000e–5(k), Fla. Stat. § 760.11(5), and 28 U.S.C.1927 (Doc. 154). They seek attorneys' fees from the filing of the complaint, or, alternatively, from the date of the plaintiff's deposition, asserting that it was or should have been clear to the plaintiff and her counsel by that time that the case was factually and legally groundless.

## II.

■ Section 2000e–5(k) of Title 42, U.S.C., provides that, in a Title VII action, "the court, in its discretion, may allow the prevailing party...a reasonable attorney's fee ... as part of the costs...." Although under this provision a prevailing plaintiff generally receives her attorneys' fees as a matter of course, equitable considerations call for a different standard for an award of attorneys' fees to a defendant in a civil rights action.[4] Consequently, prevailing defendants seeking an award of fees must establish that the plaintiff's action was "frivolous, unreasonable, or without foundation," even though not brought in bad faith. *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).[5]

■ The Supreme Court has also made clear that a litigant's duty to avoid frivolous litigation is a continuing obligation.

*Id.* at 422, 98 S.Ct. 694; *Turner v. Sungard Business Systems, Inc.*, 91 F.3d 1418, 1423 (11th Cir.1996). Therefore, advocacy of a·claim after it is clearly no longer tenable may subject the plaintiff to attorneys' fees even though the complaint was not initially frivolous. *Id.*

■ In determining whether a suit is frivolous, "a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir.1985); *Christiansburg Garment Co. v. EEOC, supra*, 434 U.S. at 421–22, 98 S.Ct. 694 (simply because the plaintiff did not ultimately prevail does not compel the conclusion that the action was unreasonable). In the Eleventh Circuit, factors considered important in determining whether a claim is frivolous include: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Sullivan v. School Bd. of Pinellas Co., supra*, 773 F.2d at 1189. These are, however, "general guidelines only, not hard and fast rules." *Id.* "Determinations regarding frivolity are to be made on a case-by-case basis." *Id.*

## III.

■ A. The plaintiff advanced at trial two theories in support of her claims of sex

---

4. Thus, awarding attorneys' fees to a prevailing plaintiff serves to vindicate congressional policy and punish a violator of federal law. *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 418, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). An award of attorneys' fees to a prevailing defendant deters frivolous lawsuits and protects "defendants from burdensome litigation having no legal or factual basis." *Id.* at 420, 98 S.Ct. 694; *see also, American Family Life*

*Assurance Co. of Columbus v. Teasdale*, 733 F.2d 559, 570 (8th Cir.1984)("the entire public inevitably suffers when a vindictive plaintiff squanders limited judicial resources by prosecuting frivolous lawsuits").

5. The FCRA is patterned after Title VII, and federal caselaw interpreting Title VII is applicable to the FCRA claims. *Florida Dep't of Community Affairs v. Bryant*, 586 So.2d 1205, 1209 (Fla.1991).

discrimination: (1) She was subjected to a hostile work environment as a result of comments and conduct of a sexual nature, and (2) she was the victim of disparate treatment in the application of an "anti-affair" policy. Unlike the belatedly-advanced disparate treatment theory, the hostile work environment contention has been in this case from the beginning. However, when the case was argued to the jury, the plaintiff virtually abandoned that claim. The failure to argue meaningfully the hostile work environment contention underscores its total lack of merit.

The hostile work environment claim is meritless for two distinct reasons: (1) It is untimely, and (2) the sexual comments and actions unquestionably do not rise to the level of severe or pervasive misconduct. For both of these reasons, the plaintiff failed to present a *prima facie* case of a hostile work environment.

At trial, the plaintiff testified to six alleged incidents of sexually-based hostile conduct occurring during her years of employment.[6] The defendants correctly contend that these alleged sexually-based hostile acts were time-barred.

■ Title VII and the FCRA require as a prerequisite to filing an employment discrimination lawsuit that the claimant timely file a charge of discrimination with the appropriate administrative agency. *See* 42 U.S.C.2000e–5(e); Fla. Stat. § 760.11(1). In this circumstance, Title VII requires that a charge of discrimination be filed with the EEOC within 300 days of the alleged discriminatory conduct. 42 U.S.C. 2000e–5(e)(1). The FCRA mandates that discrimination charges be filed within one year of the alleged misconduct. Fla. Stat. § 760.11(1). These requirements are akin to statutes of limitations; alleged acts of discrimination not timely asserted generally cannot be considered in a later lawsuit. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n. 4, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

In this case, the plaintiff's charges of discrimination were filed on July 6 and 8, 1998, with the state and federal agencies, respectively. Consequently, absent an exception, only alleged incidents of sexually hostile conduct occurring after July 6, 1997, could be considered as part of the plaintiff's FCRA sexual harassment claim, and only conduct after September 9, 1997, was actionable under Title VII.

However, the plaintiff's trial testimony clearly shows that none of the six alleged incidents of sexually hostile conduct occurred within the applicable limitations periods. Thus, the plaintiff testified to three alleged acts of harassment between February and April of 1996 and three between March and June 1997. The last alleged incident of sexually hostile conduct occurred, according to the plaintiff's complaint and sworn EEOC affidavit, on or about June 6, 1997. Moreover, although the plaintiff initially asserted at trial that the last incident of harassment occurred in July or August 1997 (and thus likely within the Florida limitations period), on cross-

---

**6.** The plaintiff may have thought there were more. Thus, on one occasion Egan called her "a neurotic bitch" after she vigorously complained once when the office locks were changed and she could not gain access. In context, this comment is not of a sexual nature. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1247–48 (11th Cir.1999) (*en banc* ), cert. denied, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). Also, the plaintiff seems to complain about a rude telephone call with an employee who called other women names. The plaintiff hung up on the person and was later required to apologize for that in connection with obtaining a necessary report. This exchange also does not fall into the category of sexual comments. However, even if both incidents are counted, it would not change the fact that the claim is untimely and that the totality of the events do not amount to severe and pervasive misconduct.

examination the plaintiff unequivocally confirmed that no sexual harassment occurred during July or August 1997. Rather, she stated that the last alleged incident of sexual misconduct by Martin was about June 6, 1997. Consequently, the sexually-based hostile acts alleged by the plaintiff were, according to her own testimony, time-barred under federal and state law because they occurred more than one year before she filed a charge of discrimination.

The plaintiff asserts that her time-barred claims were revived pursuant to the "continuing violation" exception (Doc. 159, p. 8). Significantly, the plaintiff was able to avoid summary judgment on this ground. The presentation of evidence at trial, however, reveals that the continuing violation theory is totally baseless.

The plaintiff attempts to include within the scope of the hostile work environment claim actions allegedly taken against the plaintiff as a consequence of her affair with Egan. Under this approach, the time during which the hostile work environment misconduct took place would extend up to October 1997, when the plaintiff's employment ended. However, actions relating to the affair (which, in all events, are not properly characterized as sexual harassment[7]) are entirely distinct from the alleged sexual comments and conduct by Martin. Consequently, those actions cannot be used to bring the events involving Martin within the actionable time frame.

▮ Under the continuing violation exception, otherwise time-barred claims are actionable if they are part of a pattern or continuing practice of discrimination which extends into the statutory filing period. *Roberts v. Gadsden Memorial Hospital,* 835 F.2d 793, 800 (11th Cir.1988). The

Eleventh Circuit cautioned, however, that "[t]he continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse. It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation...." *Id.* at 800. Here, there is no nexus, much less a substantial one, between the plaintiff's time-barred allegations concerning Martin's comments and conduct and her contention that she suffered adverse employment action as a result of her affair. Consequently, the continuing violation theory cannot be used to make timely the hostile work environment claim based on Martin's actions.

Besides being untimely, the plaintiff's hostile work environment claim patently lacked substantive merit. Thus, even accepting the plaintiff's testimony at face value, it did not establish a *prima facie* case of a hostile work environment sexual harassment claim.

▮ In order to maintain an action for a hostile work environment, the alleged harassing conduct must be extreme. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, a hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult." *Id.* at 78, 118 S.Ct. 998. Consequently, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80, 118 S.Ct. 998. Likewise, conduct that only amounts

---

7. The claim relating to the affair is one for disparate treatment, and that is how it was presented to the jury. A claim of disparate treatment is different than a claim of sexual harassment. *See Steele v. Offshore Shipbuild-*

*ing, Inc.,* 867 F.2d 1311, 1316 (11th Cir. 1989). Moreover, the claims are analyzed under different principles. *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 510–11 (11th Cir.2000).

to ordinary socializing in the workplace such as occasional horseplay, sexual flirtation, sporadic or occasional use of abusive language, gender related jokes, and occasional teasing does not constitute an abusive or hostile environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

To establish a hostile environment sexual harassment claim under Title VII, the plaintiff had to prove that she was subjected to "unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature," that was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (*en banc*), *cert. denied,* 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000). The question whether the harassment was sufficiently severe or pervasive to alter an employee's terms or conditions of employment involves a subjective and an objective component. *Id.* at 1246. Thus, "the employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment," and the environment must be "one that a reasonable person would find hostile or abusive." *Id.*

The plaintiff's testimony demonstrated that she did not subjectively perceive the alleged comments and conduct to be so severe or pervasive as to change the terms or conditions of her employment. Her former colleagues testified, and she acknowledged, that she participated in off-color comments and foul language in the workplace.[8] The plaintiff also testified that she would have remained an employee of the defendant companies if she had received more computer training and a salary increase, implicitly conceding that the challenged comments and conduct were not subjectively perceived as hostile.

Most fundamentally, the plaintiff testified that the incidents did not impair her ability to work. In other words, the sexual comments and conduct did not alter her terms or conditions of employment. This testimony, by itself, is enough to defeat the plaintiff's claim of sexual harassment. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)("Title VII is violated by either explicit or constructive alterations in the terms and conditions of employment").

Moreover, even if the plaintiff could demonstrate the subjective component, a reasonable person would not find the conduct hostile or abusive. In determining whether the conduct was objectively hostile or abusive, courts examine: (1) the frequency and severity of the conduct, (2) whether the conduct was physically threatening, humiliating, or a mere offensive utterance, and (3) whether the conduct unreasonably interfered with the employee's job performance. *Mendoza v. Borden, Inc., supra,* 195 F.3d at 1246.

With respect to the severity of the alleged conduct, the plaintiff's allegations were largely devoid of physical contact or overly offensive comments. Thus, the most egregious conduct alleged (and which the jury disbelieved) was that Martin brushed the plaintiff's skin above her cleavage with his hand on one occasion. Such conduct is not physically threatening or so humiliating as to constitute conduct

---

8. The nastiest comments I heard during the trial originated with the plaintiff. Thus, a female co-worker testified that the plaintiff told her that she (the plaintiff) had said to others that the co-worker used to be a man. Similarly, another employee testified that the plaintiff told her that the same co-worker had had a sex change operation. Comments of this type dispel any notion that the plaintiff was sensitive to office gossip or banter.

violative of Title VII. *See e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759 (2d Cir.1998) (comments about the plaintiff's body and the deliberate touching of the plaintiff's breasts with papers were insufficient to alter the terms and conditions of the plaintiff's employment); *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705 (7th Cir.1995) (actions by supervisor who stroked plaintiff's leg once and grabbed her buttocks on a separate occasion were not actionable). Furthermore, the bulk of the plaintiff's allegations regarded comments, which, although possibly offensive, were not severe and, as the plaintiff conceded, did not interfere with her work.

Moreover, the alleged conduct could not be considered pervasive. Thus, a total of six alleged incidents of harassment between the first occurrence in February 1996 and the end of plaintiff's employment in October 1997 fails to show any frequency of misconduct. *See e.g., Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 586 (11th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001) ("[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment") (*quoting Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir.1999) (citations omitted)); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997)(five sexually oriented offensive statements over 16 months held sporadic and insufficient to show hostile work environment). Therefore, both objectively and subjectively, the plaintiff's testimony of sexually-based hostile conduct does not establish actionable sexual harassment in violation of federal or state law.

B. The second discrimination claim presented to the jury was the contention that the plaintiff was the victim of a disparate application of an anti-affair policy. This contention was not articulated until after the pre-trial conference and just before the beginning of trial. Its belated appearance indicates a lack of merit, since otherwise it would seemingly have been raised in a more timely manner.

Unquestionably, the plaintiff sought to get mileage out of the affair from the inception of the lawsuit. Thus, in the complaint and in the pre-trial statement, the affair was mentioned, but it was characterized—inaccurately (*see* p. 1263, n.7, *supra*)—as part of a hostile work environment. Further, it was asserted at the pre-trial conference that widespread rumors of the affair prompted sexual comments, but the evidence failed to support that assertion. There was no evidence that rumors of the affair were widespread, and none that Martin, in particular, had heard about it. Also, the first three of the six incidents occurred before, or at the beginning of, the affair, and the fourth took place about nine months after the affair had ended.

Presumably due to the lack of evidentiary support for the hostile work environment claim (and possibly due to its untimeliness), the plaintiff emphasized during closing argument the disparate application of the anti-affair policy. The late development of this claim has hampered its close analysis. Thus, the plaintiff is vague about the adverse employment actions that are challenged and about the decisionmakers who purportedly took the actions.

More fundamentally, however, there are gaps in the evidence that prevent the plaintiff from establishing a *prima facie* case of disparate treatment. Specifically, there patently is insufficient evidence that (1) there was an anti-affair policy, (2) that there was a discriminatory application of any such policy, and (3) that the adverse employment actions were causally related to the affair.

The linchpin of the plaintiff's disparate treatment claim is the existence of an anti-affair policy. The plaintiff, however, did not present any probative evidence that the defendants had an anti-affair policy. Thus, the plaintiff presented no evidence of any written or oral official company policy regarding sexual relationships between employees. Furthermore, the plaintiff presented no course of conduct by the defendant companies that could be construed as such. *See e.g., Clark v. Olinkraft, Inc.*, 556 F.2d 1219 (5th Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978). There was, in fact, no evidence that an employee had even been disciplined, or even reprimanded, because he or she had had an affair, or other romantic involvement, with a co-worker.

The plaintiff at trial seemed to base the existence of an anti-affair policy upon two isolated remarks by supervisory personnel.[9] This evidence was clearly insufficient, however, to establish an anti-affair policy.

In this regard, the plaintiff asserted that, after she told her former supervisor, Annarita Nora, that she had had an affair with Egan, Nora told the plaintiff that, if she had an affair with Egan, that was her problem, but that Nora was not going to see her sales director go down because of the plaintiff. This vague remark does not show that the defendants had an anti-affair policy. Furthermore, this statement does not indicate that any employment action, adverse or otherwise, would be taken against the plaintiff. *Cf. Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1329 (11th Cir.1998). Therefore, this stray remark is wholly insufficient to establish an anti-affair policy.

The plaintiff also testified that Van Ayvasian, then general manager, commented to her at some ill-defined time, possibly in the Spring of 1997, that, if he thought that the plaintiff had had an affair with Egan, the plaintiff would have been fired. However, Ayvasian, who denied making such a statement, did not fire the plaintiff. Consequently, Ayvasian's disputed comment does not provide meaningful evidence of an anti-affair policy. The comment, at most, shows that Ayvasian had an *ad hoc* objection to employees having affairs. However, since there is no evidence that Ayvasian ever acted upon his objection, the comment cannot reasonably provide a basis for finding that the defendants had an anti-affair policy.

Moreover, even assuming there was an anti-affair policy, there is no evidence that it was enforced in a discriminatory manner. Of course, Ayvasian cannot be found to have engaged in disparate treatment, since he did not take any action against the plaintiff for having an affair. Further, there is no evidence that some other official or supervisor treated the plaintiff differently than he or she treated a male employee who was known to have had an affair.

In order to establish a *prima facie* case of disparate treatment, the plaintiff must show that (1) she was a member of a protected class, (2) she was subjected to adverse employment action, and (3) her employer treated similarly situated male employees more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir.

---

9. Interestingly, in the plaintiff's opposition to an award of attorneys' fees, these two remarks are not argued as evidencing that the defendants had an anti-affair policy (Doc. 158, pp. 8–9). Rather, the plaintiff argues that she "could reasonably imply [*sic*] that the company would not tolerate affairs between employees" because the "[p]laintiff was told by Egan that he did not want the company to find out about the affair because of possible consequences" (*id.*).

1999); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). Thus, in the context of a policy violation, the plaintiff must show that male employees were involved in, or accused of, the same or similar conduct and were disciplined in different ways. *Maniccia v. Brown, supra,* 171 F.3d at 1368–69.

In this case, there is no evidence that any male employee beside Egan ever engaged in an affair or similar sexual conduct. Thus, only Egan could be used as the comparator. However, the plaintiff made no effort to develop Egan (or anyone else) as a comparator. For example, the plaintiff did not present any evidence that Egan's superiors had received any credible information in a timely manner that Egan had had an affair. Further, there is no evidence that Egan asked for, and received, favorable treatment similar to that which the plaintiff complains she asked for, and was denied, *i.e.,* an early and large salary increase, more computer training, and additional time to depart after the submission of a letter of resignation (*see* pp. 1267–68, *infra* ).

Not only did the plaintiff fail to present evidence at trial showing Egan to be a valid comparator, but during the pre-trial stages she made statements that directly contradict that idea. Thus, the plaintiff asserted in her complaint and in opposition to the defendants' motion for summary judgment that Ayvasian would have threatened *Egan's* employment if Ayvasian learned that Egan was having an affair with a colleague (*see* Doc. 2, ¶ 18.7 (As a result of information Ayvasian received regarding the affair, "Ayvasian threatened *Egan's employment* and Scelta's employment.") (emphasis added); (Doc. 83, p. 3)(If Ayvasian learned of the affair, then "Egan's job and his family life would be in jeopardy.")). In light of these assertions, and the absence of evidence showing Egan's situation following the affair, there is no basis for viewing him as a valid comparator. And, as indicated, there is no other male who fills that role.

In addition, the plaintiff failed to present any probative evidence showing that she suffered adverse employment action as a result of the affair. With respect to the disparate treatment claim, the plaintiff appeared to complain of three discriminatory adverse job actions: (1) rejection of her request for a salary increase; (2) inadequate computer training; and (3) termination.

As to the salary increase, the plaintiff requested a raise of $11,000. Moreover, she requested it several months before the defendants' had scheduled an annual pay review. The denial of this request was fully consistent with the defendants' established policy.

The plaintiff also complained that she was denied training on a computer software program called Genesys that was essential for her to carry out her job working with distributors. The head of the defendants' computer system testified that the plaintiff was given training on the Genesys system, but that she grew impatient before the training was completed and left. He said that he offered to be available for more training if she wanted. He added further that most of the distributors do not use the Genesys system.

The plaintiff also testified that she was fired from her job with the defendant companies. However, the plaintiff acknowledged that, prior to her alleged firing, she had already tendered her "long-term" resignation to the defendants because her request for a raise would not be considered until the beginning of the new year. In that situation, she was to remain at her job while a replacement was located and trained, and, presumably, while she looked for a new job. Shortly thereafter, however, the plaintiff was directed to go to At-

lanta to meet Stan Epperson, a distributor of the defendants' products, but she did not go happily. After a somewhat unpleasant day, at least, the plaintiff returned to Florida early. The next day, after a discussion with Egan, she left her job with two weeks' severance pay.

The defendants have provided strong justification for their actions with respect to each of these three complaints. This circumstance strongly undercuts the plaintiff's attempt to tie these employment actions to her affair. Furthermore, the plaintiff has failed to come forward with any evidence that raises an inference that these actions were taken because of the affair.

The three employment actions occurred a year or more after the affair ended. Consequently, the affair was so remote in time from the employment actions that a causal relationship cannot reasonably be inferred. *See Maniccia v. Brown, supra,* 171 F.3d at 1369–70. The concept of *post hoc, ergo propter hoc* is recognized to be logical fallacy, *Black v. Food Lion, Inc.,* 171 F.3d 308, 313 (5th Cir.1999), and thus a causal relationship should not be inferred simply because the employment actions came after the affair. *See Bermudez v. TRC Holdings, Inc.,* 138 F.3d 1176, 1179 (7th Cir.1998).

Moreover, there is nothing in the circumstances surrounding the denial of the request for an extraordinary raise that supports an inference that the request was denied because of the affair. Similarly, there is nothing about the alleged denial of additional computer training that suggests that the denial was related to the affair, especially since the person in charge of the computer program (who said he volunteered to provide more training to the plaintiff if she desired) appeared to be outside the chain of supervisory authority and would seemingly be in no position to discipline the plaintiff for having an affair (assuming that he even knew about the affair, and there is no evidence that he did).[10]

In addition, even accepting the plaintiff's version that, at a meeting the day after the Atlanta trip, Egan called her a "troublemaker" having an attitude and told her to leave, as opposed to Egan's version that the plaintiff was loud and foulmouthed and said she had had it with the company, it is not reasonable to infer that the affair played any role in the end of the plaintiff's employment. Thus, the end came after the plaintiff had submitted a letter of resignation and had had, from the defendants' viewpoint, an unacceptable meeting with an important distributor. Furthermore, if, as the defendants persuasively point out, Egan was concerned about disclosure of an affair, it would be counter-productive for Egan to make the plaintiff mad by discharging her. In other words, assuming that Egan and the plaintiff had had an affair, Egan's termination of the plaintiff in all likelihood would not be due to the affair, but would be in spite of it.

In connection with the trip to Atlanta, the plaintiff argues that she was set-up for failure due to her lack of knowledge of the Genesys system. However, Epperson did not use the Genesys system, and his business already had a different computer system in place. Moreover, there is no evidence that that circumstance made any difference to the defendants, especially

10. The plaintiff complains that computer training was provided to a particular male employee, who is referred to in various demeaning terms. In the absence of evidence that the male employee had participated in an affair and the defendants knew about it—and there is no such evidence—that training is completely irrelevant to the disparate treatment claim. However, the reliance upon that training underscores the weakness of her claim.

since most distributors did not use the Genesys system. Consequently, the contention that the plaintiff was set-up for failure due to her lack of knowledge of the Genesys system is simply a bogus argument. As previously noted, that type of argument is evidence of the meritlessness of the disparate treatment claim.

■■ In sum, there was no probative evidence of an anti-affair policy. Further, assuming the existence of such a policy, the plaintiff failed to show that it was applied more favorably to some male than it was to her. In addition, the plaintiff did not demonstrate that the adverse employment actions she challenges had a causal relationship with a violation of an anti-affair policy. The plaintiff therefore failed to present a *prima facie* case of disparate treatment.

### IV.

As indicated, other factors, besides the legal merit of the claims, are to be considered in determining whether to award attorneys' fees to a prevailing defendant in a Title VII case. Those factors are whether the defendant offered to settle and whether the case was dismissed or went to trial.

A. The record reflects that the defendants did make reasonable settlement offers, but that the plaintiff rejected them (*see* Doc. 154, Ex. A. Turkel, Hyman & Salim Affs.). Thus, the defendants initially offered $30,000 to settle the case (*id.* at Salim Aff., ¶ 16). The defendants, furthermore, averred that they were willing to increase their settlement offer to $75,000 during mediation, but that the mediator suggested that that figure would be insufficient to satisfy the plaintiff, so that it was never presented to her (*id.* at Hyman Aff., ¶ 6).

Moreover, the plaintiff was warned, after she had rested, that the case bordered on the frivolous and that she was therefore exposed to a claim for attorneys' fees. In accordance with my suggestion that the parties settle at that point, the defendants offered to waive any request for attorneys' fees and costs in exchange for the plaintiff's dismissal of this suit (*id.* at Turkel Aff., ¶ 12). That offer was not only rejected, but, incredibly, the plaintiff responded with a demand of $175,000 (Doc. 160, p. 271).

The plaintiff's rejection of the defendants' offer to forego their substantial claim for attorneys' fees was, in my view, unreasonable. The plaintiff had been told not only that I thought the discrimination claims bordered on the frivolous, but that, in all likelihood, if the jury returned a verdict for the plaintiff on those claims, I would throw the verdicts out. Furthermore, while I intended to accept the jury's verdict on the battery claim, since that was a pure credibility choice, the plaintiff during closing argument only requested on that claim $1,000 in compensatory damages and $5,000 in punitive damages.

Notably, in a recent case before me a *pro se* plaintiff found himself in the same position as the present plaintiff during the trial of his discrimination case. He elected to end the prosecution of his claim in return for an agreement by the defendant not to pursue attorneys' fees and costs. The plaintiff here took a more heedless course, apparently in pursuit of a large verdict. Having taken that gamble after being warned of the potential consequences of an award of attorneys' fees, the plaintiff should not reasonably expect to be extricated from the results of her choice. The plaintiff's refusal to settle thus weighs strongly against her.

■■■ B. The consideration of whether there was a pre-trial dismissal or a trial obviously does not cut against the plaintiff, but it also does not significantly militate in her favor. Advancing beyond summary judgment does not establish that

a case has merit or immunize a party from attorneys' fees. *See e.g., Nielsen v. Trans World Airlines, Inc.*, 95 F.3d 701, 703 (8th Cir.1996); *Flowers v. Jefferson Hospital Ass'n,* 49 F.3d 391, 392–93 (8th Cir.1995); *Hutchinson v. Staton,* 994 F.2d 1076, 1081 (4th Cir.1993) (allowing a claim to go to trial does not negate the plaintiff's responsibility to litigate a factually grounded claim at trial).

In this case, the hostile work environment claim was not conducive to resolution on summary judgment because of the volume of details it involved and the imprecision of the plaintiff's theory, which sought to include the alleged affair within that claim. As to that claim, it is appropriate to repeat that, "[a]lthough in some instances a frivolous case may be quickly revealed as such, it may sometimes be necessary for defendants to 'blow away the smoke screens the plaintiff[ ] had thrown up' before the defendants may prevail." *Flowers v. Jefferson Hospital Ass'n, supra,* 49 F.3d at 393 (*quoting Introcaso v. Cunningham,* 857 F.2d 965, 967 (4th Cir.1988)). Of course, the disparate treatment claim could not have been decided by a summary judgment motion because it was not articulated until shortly before trial after the dispositive motion cut-off date.

C. The factors set out in *Sullivan v. School Bd. of Pinellas County,* for the stated reasons, strongly point in favor of an award of attorneys' fees to the defendants. Although those factors are not necessarily exclusive, the parties have not specified any other factor that is thought to be applicable.

Plaintiff's counsel does assert, without any supporting authority, that "[f]ees should only be assessed in extreme cases" (Doc. 159, p. 2). I am prepared to accept that principle. However, it seems to me that this lawsuit is such a case. I have resolved a substantial number of employment discrimination cases, including several where judgment was entered for the defendant as a matter of law. Never before have I concluded that an award of attorneys' fees to a defendant was justified.

 In my view, the only debatable issue is not whether attorneys' fees should be awarded, but whether they should be awarded from the beginning of the lawsuit or from some later point in the proceedings. The defendants suggest that fees should be awarded from the filing of the action, or alternatively, from the time of the plaintiff's deposition in late August 1999 (Doc. 155, p. 18).

It seems to me that some tolerance should be afforded employees who think they were discriminated against so that those with valid claims are not inappropriately deterred from seeking relief on those claims. Particularly where, as here, the pertinent facts are extensive, it seems unwarranted to impose attorneys' fees and expenses from a date prior to the commencement of discovery.

Furthermore, I am hesitant to find that the completion of the plaintiff's deposition is the time when the plaintiff and her lawyer became aware that her discrimination claims were meritless. It is difficult, if not impossible, to determine from the record precisely what the status was at that time of the information that had been developed and of the legal theories that were being considered. Accordingly, I will give the plaintiff the benefit of the doubt and not award fees from that date.

However, by the time of the pre-trial conference on April 18, 2000, discovery should have been completed and legal theories should have been established. There was no justification from that point on for pursuing the discrimination claims. Consequently, attorneys' fees and expenses shall be awarded to the defendants from,

and after, April 18, 2000, the date of the pre-trial conference.

## V.

The defendants also move under 28 U.S.C.1927 to assess attorneys' fees against plaintiff's counsel.[11] Section 1927 provides that a lawyer who multiplies the proceedings "unreasonably and vexatiously" may personally be assessed the resulting excess costs, expenses and attorneys' fees. There is little case law in the Eleventh Circuit concerning the standards applicable to an award of attorneys' fees under § 1927. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1395 (11th Cir.1997). Moreover, decisions from other circuits are not in agreement on the governing principles. In particular, some circuits have held that bad faith is required for an award under § 1927, *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir.1991), and others have held that it is not, *Wilson–Simmons v. Lake County Sheriff's Dep't,* 207 F.3d 818, 824 (6th Cir.2000); *Miera v. Dairyland Ins. Co.,* 143 F.3d 1337, 1342 (10th Cir.1998).

▮ These differing interpretations of § 1927 could potentially present a problem because I am not prepared to say that plaintiff's counsel acted in bad faith in the sense that he acted with dishonesty of belief or purpose. *See Black's Law Dictionary* (7th ed.), p. 134. It does appear that, if plaintiff's counsel had presented the facts in a fair and straightforward way, the hostile work environment claim would have been resolved on the motion for summary judgment. However, because I was not involved in handling the dispositive motions up through the motions for summary

judgment, I am reluctant to assess the mental state of plaintiff's counsel during that period. Unquestionably, plaintiff's counsel misrepresented the facts of the case to me at the pre-trial conference when he said that "rumors or knowledge about the affair tainted my client as being fair game to be hit on by men in the office" (Doc. 122, p. 11). There was no evidence presented at trial that supported that assertion (*see, supra,* p. 17). Nevertheless, the misrepresentation by itself will not justify an award under § 1927 because it did not multiply the proceedings. *See Peterson v. BMI Refractories, supra,* 124 F.3d at 1396.

▮ The absence of a finding that plaintiff's counsel acted with dishonesty of belief or purpose, however, does not preclude an award under § 1927. The Eleventh Circuit has indicated that attorneys' fees may be awarded for "conduct tantamount to bad faith." *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). Furthermore, it has agreed with the Ninth Circuit that "[a] finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument...." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (*quoting Primus Automotive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)). The court of appeals has also said in this connection that "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Avirgan v. Hull, supra,* 932 F.2d at 1582.

▮ In this case, plaintiff's counsel clearly breached the duty to discontinue

---

11. It is noted that the defendants do not base a claim for attorneys' fees against plaintiff's counsel upon either Rule 11, F.R.Civ.P., or the court's inherent authority. Accordingly, those grounds for attorneys' fees will not be considered.

the discrimination claims after it became apparent, which was no later than the time of the pre-trial conference, that the evidence would not support those claims. Certainly by that point, plaintiff's counsel was guilty of, at least, recklessly asserting a frivolous argument. Moreover, the attorney implicitly conceded this by virtually abandoning the hostile work environment claim during closing argument. Also, the disparate treatment claim that was the primary focus of the closing argument was first asserted on the eve of trial, which suggests that, if the claim had any merit, it would have been raised much sooner than it was.

For these reasons, an award of attorneys' fees against plaintiff's counsel under § 1927 is warranted. Indeed, it seems unfair to saddle just the plaintiff with the imposition of attorneys' fees under the circumstances of this case. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 768, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (Blackmun, J., concurring and dissenting). Clearly, plaintiff's counsel had the responsibility of explaining to the plaintiff the developing law of sexual harassment, a concept that could easily be misunderstood by a lay person. Furthermore, it was obviously plaintiff's counsel, not the plaintiff herself, who was the creator of the changing legal theories proffered on the discrimination claims. The blame for those frivolous theories should not fall exclusively upon the plaintiff.

Plaintiff's counsel seeks to avoid, or at least reduce, his responsibility by contending that it was solely the plaintiff's decision to reject the defendants' final settlement offer of a dismissal in return for a waiver of fees and expenses. In this respect, he asserts that, because the defendants had threatened to seek an award against him, as well as the plaintiff, he considered that he had a conflict of interest, so that he was "ham-strung" in that he could not influ-

ence the plaintiff to dismiss the case (Doc. 159, pp. 7–8).

This assertion rings hollow. In the first place, I am skeptical whether it is made in good faith. It seems to me that plaintiff's counsel was more than willing to go forward, particularly since he transmitted in response to the defendants' offer the astonishing demand of $175,000. Furthermore, in light of the attorney's extended relationship with the plaintiff, he in all likelihood would know what result to expect if he left the matter to the plaintiff's uncounseled judgment. Consequently, counsel's approach appears to me to be an attempt to create some protection for himself in the event he was faced with a claim for attorneys' fees.

In addition, plaintiff's counsel, having perceived a conflict, should not have left the plaintiff, as he said he did, to evaluate the offer without any guidance. At a minimum, he should have brought the conflict to the court's attention. At that point, I would have advised the plaintiff in blunt terms about her exposure to attorneys' fees if she declined the offer. Further, I would have explored the possibility of having the plaintiff consult with an independent attorney. Of course, that option was available even without court intervention, especially since a weekend had intervened. In all events, plaintiff's counsel, if he actually thought there was a conflict, should have taken some steps to see that the plaintiff received adequate advice regarding the settlement offer.

Counsel's failure to take those steps, however, certainly cannot be a basis for avoiding an award of attorneys' fees under § 1927. As previously explained, plaintiff's counsel was blameworthy toward the defendants and the court by recklessly arguing frivolous contentions. He cannot avoid that blame by showing that he was also deficient in his duty to his client.

It is, therefore, upon consideration

ORDERED:

1. That the defendants' Motion for Attorneys' Fees (Doc. 154) is **GRANTED** to the extent that the defendants are **AWARDED**, against the plaintiff and plaintiff's counsel, David P. Montgomery, jointly and severally, their reasonable attorneys' fees in defending the plaintiff's sexual discrimination claims from the date of the pre-trial conference (April 18, 2000). The defendants are also **AWARDED** recoverable reasonable costs incurred from that date. The amount of the fees and costs are to be determined subsequently. If the defendants are seeking recovery of any costs pursuant to 28 U.S.C.1920, they must separate and list those costs; otherwise, only 42 U.S.C.2000e–5(k) will be considered as a basis for the recovery of costs.

2. That the defendants have thirty (30) days to submit an itemized statement of their fees and costs, along with any supporting documentation. It is questionable whether the defendants can recover attorneys' fees charged at non-local rates, or for time spent solely on the battery count or on the issue of the plaintiff's employer. Unless these matters are eliminated in the fee claim, they must be justified in a memorandum accompanying the fee claim. The memorandum may also address any other pertinent issue concerning fees and costs.

3. That the plaintiff shall have thirty (30) days from the date such materials are served to file a detailed response to the defendants' claim for attorneys' fees and costs. The response must specifically identify and explain all objections to any rate, time, or cost which the plaintiff claims is unreasonable or otherwise unrecoverable. All items not specifically objected to with a cogent explanation will be granted.

*ORDER*

THIS CAUSE came on for consideration upon David P. Montgomery's Motion for Reconsideration (Doc. 169), and upon the plaintiff's *pro se* Motion to Reconsider (Doc. 171).

These motions raise no substantial contention that has not already been considered, and addressed, in the 36–page Order. The motions do, as the defendants note, engage in significant finger-pointing. That exercise, however, does not exonerate either the plaintiff or her attorney from an award of attorneys' fees.

The plaintiff was amply warned of the potential for attorneys' fees and had an opportunity to avoid them. She not only rejected that opportunity, but rapaciously responded with a $175,000 demand. In light of the plaintiff's avariciousness, she does not deserve to be excused from an award of attorneys' fees.

The attorney was the architect of this frivolous case. As previously explained, at least by the time of the pre-trial conference, he should have known better.

It is, therefore, upon consideration.

ORDERED:

1. That David P. Montgomery's Motion for Reconsideration (Doc. 169) be, and the same is hereby, **DENIED.**

2. That the plaintiff's Motion to Reconsider (Doc. 171) be, and the same is hereby, **DENIED.**